UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cr-00015-cr |
| | ) | |
| TERESA YOUNGBLUT, | ) | **Filed Under Seal** |
| Defendant. | ) | |

### DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION FOR USE OF A GOVERNMENT FILTER TEAM TO ASSESS PRIVILEGES HELD BY THE DEFENDANT AND MOTION TO FILE UNDER SEAL

In its Motion in Support of the Government's Proposed Discovery Protocol ("Gov't Mot."), filed on June 4, 2025, the government proposes the use of a filter team to review the defendant's pretrial detention records. The government's motion was accompanied by a Proposed Order (the "Proposal") which would place government attorneys and agents in charge of the initial review and determination of which documents are privileged materials, creating a foreseeable and unacceptable risk of the disclosure of privileged materials. The government has offered no necessity or exigency that would justify such an approach, and the Court should reject the government's proposal. The risk of disclosure of privileged materials is too great, the resulting prejudice to the defendant is too damaging, and the appearance of unfairness created by the government screening for the defendant's own protected privileges—including attorney-client and attorney work product privileges—all make the government's proposal unacceptable, particularly in a case in which the government has clearly indicated that it intends to seek the death penalty.

I. **The government's Proposal creates an unacceptable risk of disclosure of privileged materials**

As an initial matter, it is important to note that there are substantial inconsistencies between the assurances of neutrality and fairness provided in the government's motion, and the Proposal which lays out the terms of the government's actual proposed protocol. Most significantly, the process in the Proposal allows for not one but two opportunities for the prosecution team to have access, inadvertent or otherwise, to privileged materials. In its motion, the government assures the court that no privileged materials will be provided to the prosecution team without the defense having had an opportunity to review and object to the materials. *See* Gov't Mot. at 5, 7, 10. The government argues that this is a protection afforded to the defense and is intended to address the concern expressed by other courts about potentially privileged documents being shared to the prosecution team without the defense first having an opportunity to review those materials and assert objections. And yet the Proposal submitted with the government's motion provides no such protections.

First, the government's Proposal leaves the initial screening process to the jail or detention facility and requires that the defense divulge the names and email addresses of all members of the defense team who might be communicating with client to reduce the chances the jail will produce those calls, and to facilitate later screening by the government. *See* Proposal at ¶ 3. This aspect of the Proposal itself invades the attorney-client and attorney work product privileges and infringes on the defendant's Sixth Amendment rights to counsel. The government is not entitled to know the name of every member of the defense team, which is expected to include investigators, mitigation specialists, and various consulting and other experts, and the defense should not have to provide that information to the government in order to maintain the defendant's privileges.

Second, the government's Proposal then directs the prosecution team to make a distinction, often a fine one, among various pretrial records to determine whether they qualify as "Designated Pretrial Detention Records" that may contain privileged information. Proposal ¶ 2. Of course, pretrial detention records, ███████████████████████████ ███████████████████, are not produced in the discrete categories laid out in the Proposal. Instead, categories are often inextricably intermingled. The Proposal does not address how the categories will be interpreted, but what is clear is that this initial review of pretrial detention records will be performed by the prosecution team. If, and only if, the prosecution team determines that the materials produced contain "Designated Pretrial Detention Records," will it then turn those documents over to a filter team. Of course, at least an initial review will have already occurred at this point, with no recourse to knowing what has been reviewed and whether inadvertent disclosure of privileged information has already occurred.

Third, the Proposal describes the filter team as a "team of Government attorneys and agents not involved in the prosecution of this case that is designated to conduct an initial review of the Designated Pretrial Detention Records for Potentially Protected Material." Proposal at ¶ 4. The filter team would review the potentially privileged materials and "determine which records constitute or contain [privileged information] and which are not privileged." *Id.* ¶ 5. The filter team would then produce the documents it has unilaterally deemed non-privileged to the prosecution team. *Id.* The Proposal affords no opportunity for the defendant to see what documents are being produced to the government under this provision unless and until they are produced in discovery. By then, though, the prosecution team will have already reviewed the material and any privileged or protected documents/recordings therein.

Fourth, as described above, the Proposal provides defense the opportunity to review only those documents that the filter team has determined contain potentially privileged information. *Id.* ¶ 6. But even then, the Proposal would require that the defendant's objections to any materials it is permitted to review be accompanied by a highly detailed privilege log that includes several categories of information that are not necessary to establish a privilege, are unduly intrusive into defense work product, and would make it challenging if not impossible to produce within the thirty (30) days allotted under the Proposal. For example, the Proposal requires the privilege log to include the name, capacity and location of every author and recipient of a challenged document, the date the document was created, and "transmittal details of the document, if any." *Id.* ¶ 6(b)(i)-(viii).

The government's Proposal has multiple junctures that risk disclosure of privileged materials, a risk that the Proposal itself acknowledges. Paragraph 8 allows the Defendant to object to documents disclosed to the prosecution team, at which point the government proposes that the Filter Team would "claw back" the material from the prosecution team, and the matter would be resolved by the Court. Of course, by that time, the prosecution team will have already had access to the material, may have made prosecutorial decisions based on having seen those materials, and may have already made derivative use of those materials. This Proposal thus contemplates the scenario in which the barn doors are closed after the horses have already left.

The risk of disclosure of privileged materials under the government's Proposal is unacceptable, particularly in a case in which the government has indicated it intends to seek a sentence of death.

II. **The government's proposed use of a filter team is not appropriate in the context of this case.**

The government's motion cites a number of cases in which filter teams have been approved by courts. But none of the cases have involved capital cases, documents not already in the possession of the government, and most have not involved attorney-client communications. For example, the government cites to *United States v. Avenatti*, 599 F. Supp. 3d 274 (S.D.N.Y. 2021) as an example of a court-approved use of a filter team. In that case, the government obtained a search warrant for a civil attorney's records that included a protocol for a filter team to screen for potentially privileged documents that had been approved when the warrant issued. But *Avenatti* differs in several crucial ways from this case. First, files seized were not from a criminal defense attorney, but from a civil attorney who was being criminally investigated for fraud, including allegations that he had defrauded his own clients. Second, the court noted that Mr. Avenatti had had an opportunity to review and object to any documents **before** they were disclosed to the prosecution team and had made no objections to the procedure or the disclosure of any documents. And finally, the *Avenatti* court considered the use of a filter team raised in the context of a motion to suppress, which was the first time Mr. Avenatti had objected to the procedure. The *Avenatti* court noted all of these factors in distinguishing the Fourth Circuit's decision in *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019).

In this case, of course, two of the privileges implicated are the attorney-client and attorney work product privileges, and in the context not just of a criminal case, but a criminal case in which the government has indicated that it intends to seek a sentence of death. Other essential privileges, such as psychotherapist-patient and doctor-patient, are also implicated, and the need to protect those privileges in this case—in which the government may seek to use those same documents against Ms. Youngblut in a capital sentencing proceeding—is essential. If

5

anything, the need to scrupulously protect sensitive privileges is even more acute in this case than it was in the Fourth Circuit case.

Another distinction, noted correctly by the government in its own motion, is that the records sought in both *Avenatti* and the *In re Search Warrant* had been obtained by a search warrant and were already in the possession of the government. As acknowledged by the government, when the records are not yet in the presence of the government, "the exigency typically underlying the use of taint teams is not present." Gov. Mot. at 6 (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006)). Here, the government has in its possession a batch of recorded jail communications that it has not yet reviewed. All the other categories of documents addressed in the government's Proposal relate to documents **not** in the government's possession, but that it anticipates seeking in the future. In this case, there is not a concern that the government's investigation would be impeded by external review of the documents. At most, the government will need to wait 14 days until those records have been screened by the defense and will have the opportunity to challenge any assertions of privilege.

### III.  The government's Proposal would create an appearance of impropriety in this highly publicized case in which the Department of Justice has already indicated it believes a sentence of death is appropriate.

Another reason to adopt the defense proposal and reject the government Proposal is that the use of filter teams undermines public confidence in the fundamental fairness of judicial proceedings, which is especially important in the context of a capital case. As one court observed, "The appearance of Justice must be served, as well as the interests of Justice. It is a great leap of faith to expect that members of the general public would believe any such [ethical] wall would be impenetrable; this notwithstanding our own trust in the honor of an AUSA." *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. Jan. 21, 1994); *see also United States v. Gallego*, No. 4:18-cr-1537, 2018 WL 4257967, at *2 (D.

Ariz. Sept. 6, 2018) ([E]ven if no leaks occur, the use of walled-off taint teams undermines the appearance of fairness and justice."); *Preventive Med. Assocs., Inc. v. Massachusetts*, 992 N.E.2d 257, 272 (Mass. 2013) ("[U]se of an independent special master offers a far greater appearance of impartiality and protection against unwarranted disclosure and use of an indicted defendant's privileged communications.").

Exacerbating both the very real risk of disclosure of privileged documents to the prosecution team and the appearance of impropriety, the government's Proposal provides no assurances about who the members of the filter team would be,[1] nor any assurances that members of the filter would not later work with the prosecution team on aspects of the case. Even if no privileged documents were shared, the members of the filter team cannot "unknow" information, and it would be impossible to sort out what impact this knowledge would have on the prosecution's strategy at trial and sentencing.

This appearance problem is significantly compounded by the fact that the filter-team process is conducted behind closed doors under the government's own supervision, making it difficult if not impossible for anyone outside the government to know whether an unauthorized disclosure of privileged information has occurred. "[T]he secretive nature of cases in which taint teams are often employed leave many accounts of botched procedures that result in privilege leaks relegated to rumor or sealed judicial memoranda." Roland Behm et. al., "Trust Us:" Taint Teams and the Government's Peek at Your Company's Privileged Documents, ACC Docket, June 2010, at 74, 82-83. The use of filter teams calls into question the fairness of judicial proceedings

---

[1] The government's proposal does not even establish that attorneys would be making the privilege determinations, as the filter team is consistently defined as a team comprised of both attorneys and agents.

7

where privilege is at issue in any type of case, but nowhere more acutely when the government is seeking the death penalty.

Even if filter teams have been approved and used in other cases, there is no reason to invite the potential for prejudicial error, as well as the certain appearance of impropriety, in a capital case. The case of *United States v. Pederson*, 2014 WL 3871197, Crim. Case No. 12-431 (D. Or. Aug. 6, 2014) is a powerful illustration of the dangers of using taint or filter teams in a capital case, where the stakes are high, and mistakes can jeopardize the integrity of the entire case. In *Pederson*, after litigation over the filter team's destruction of *Brady* material and disclosure of privileged materials to the prosecution team (which was not discovered for an extended period of time), the government withdrew its notices of intention to seek death, and the parties entered plea agreements that concluded the litigation. The *Pederson* court still issued an advisory opinion to express its concern about the improper conduct by the filter team and the government. The *Pederson* court noted that, in spite of the Assistant United States Attorneys' best efforts to obtain only non-legal calls from the jail facilities, members of the first filter team received more than 70 calls between the two defendants and their attorneys. Some of those calls were then produced to the trial team, and later produced in the course of discovery, which was the first notice that the defense received about the improper disclosure. *Id.* at *12-*18.

After a four-day evidentiary hearing, the government withdrew its notices of intention to seek death. Among the other violations found was that one the attorneys working on the first filter team later joined the prosecution team, and her prior access to the privileged communications was not disclosed until the ensuing litigation. *Id.* at *17. As the Court noted, the mishandling of privileged communications "very nearly jeopardize[ed] this case altogether." *Pederson*, 2014 WL 3871197 at *1.

IV.    **If implemented, the government's Proposal would chill the same sensitive communications that the privileges are designed to protect.**

The defendant's Fifth Amendment due process rights, and Sixth Amendment right to counsel also are implicated and jeopardized by the Proposal. If implemented, the Proposal would necessarily chill attorney-client communications. Ms. Youngblut is currently housed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Just knowing that one of those calls might make it into the government's hands impermissibly interferes with the attorney-client privilege and Ms. Youngblut's Sixth Amendment right to the assistance of counsel. If there is concern among members of the defense team that their communications may be disclosed to the government, filter team or not, that will create a chilling effect on candid attorney-client communications, which is the very harm that the privilege seeks to avoid. Similarly, concerns about the potential disclosure of privileged communications, defense strategy, team composition, and selection of experts, among other things, would compromise the defendant's Sixth Amendment right to the assistance of counsel. Similarly, the potential for the government to have access to Ms. Youngblut's treatment and mental health records would impermissibly chill the ability of Ms. Youngblut to speak candidly with treatment providers to obtain appropriate care.

V.    **The government's Proposal adds unnecessary complexity and demands on the Court's time with no compelling reason.**

In addition to the substantive and constitutional benefits of the defense approach, there are practical benefits to the Court and the smooth administration of this case. It will be much easier, and more efficient, for the parties to resolve any privilege disputes during the pretrial stage (as was demonstrated in *United States v. Gendron*, 2024 WL 1853385 (W.D.N.Y. Apr. 29, 2024). Under the government's approach, the defense would have to challenge improper

disclosure after the fact, which may be revealed at any stage of the proceeding, including mid-trial, and would trigger additional litigation over the derivative use of any improperly disclosed information.

The concerns raised by Ms. Youngblut are the same ones that animated the Honorable Lawrence J. Vilardo to implement the defense proposal in the only other pending capital case in the Second Circuit:

> Gendron also seeks to ensure that the facilities do not provide privileged records to the government. Docket Item 15 at 2. This Court agrees that it is crucial to ensure that the government does not obtain any privileged records. Indeed, government interference in the relationship between counsel and a defendant may violate the defendant's right to the effective assistance of counsel under the Sixth Amendment. *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985). And intercepting a defendant's communications can threaten that right by, for example, inhibiting free exchanges between the defendant and counsel. *Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977).
>
>  ....
>
> Moreover, the defense has suggested other privileges that might be implicated, such as the psychotherapist-patient privilege. See *Jaffee v. Redmond*, 518 U.S. 1, 15-16 (1996) (explaining that the psychotherapist-patient privilege covers confidential communications made to licensed psychiatrists, psychologists, and social workers in the course of diagnosis or treatment). And it may not always be obvious that a communication is protected by that privilege: Intake questions about mental health, for example, may implicate the psychotherapist-patient privilege. See Docket Item 20 at 6-7.
>
> Some entity must review the records to ensure that they fit within the government's request and do not violate Gendron's rights and privileges. The government wants the entity to be its own filter team. Docket Item 146 at 11-12. It correctly notes that courts in this circuit have approved the use of such teams. *Id.* at 11; *see e.g.*, *United States v. Avenatti*, 559 F. Supp. 3d 274, 282 (S.D.N.Y. 2021). But the government has not shown that a filter team is the only acceptable—or even the better—approach.
>
> In fact, as between a government filter team and the defense, the defense is better suited to sort these records. The defense has the relevant information necessary to give the government the information it requests, and no more. Consider the visitor logs, for example. The defense knows the names of its own team members and experts and can easily redact the logs to remove those names.

> Moreover, the defense is highly motivated to protect Gendron's rights and privileges. That is paramount given the unique and important nature of this case. *See, e.g.*, *California v. Ramos*, 463 U.S. 992, 998-99 (1983) ("[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."); *Gardner v. Florida*, 430 U.S. 349, 357 (1977) ("[D]eath is a different kind of punishment ...."). The defense's proposal also allows the Court to take a familiar role as a backstop. *See In re Grand Jury Subpoenas Dated Mar. 18, 2022 & Aug. 2, 2002*, 318 F.3d 379, 386 (in camera review is a common practice for producing materials that may be privileged).

*Gendron*, 2024 WL 1853385, *4-*5.

Given the unacceptable risk of disclosure of privileged materials to the prosecution, and the lack of meaningful remedy if such disclosure occurs, there is simply no compelling reason to allow any members of the government to determine the presence of a privilege, particularly when the defense team is so much better situated to assess any privileges in the first instance. In short, the potential prejudice to the defendant is extreme, while the impact on the government is slight. The defense protocol provides for a rapid review and disclosure of any of client's detention records. In the cases of jail calls, for example, that review will largely consist of a screening for phone numbers – known to the defense team – to ensure that no privileged communications have been included. The defense should not have to disclose all of the names, numbers and email addresses of every member of the defense team when it will be much more efficient, and reliable, for the defense to screen for privileged communications.

## VI.    Motion to file under seal.

This Court granted the defense's request to have its initial motion filed under seal. Every filing related to that motion, including the government's response, has been filed under seal. For the same reasons, the defendant moves this Court to seal this motion and any order that results from it.

**VII.     Conclusion.**

The issue before the Court is a discrete one and impacts only medical and detention center records of the defendant. The parties agree that those records can be expected to include some privileged materials, and that they must be screened for privilege before the prosecution team can review them. The Court is being offered two alternatives proposals for how to proceed: (1) the defense proposal, which provides maximum protection against the inadvertent disclosure of privileged information and prevents the appearance of impropriety in what is expected to be a capital case, or (2) the government's Proposal, which creates an unacceptable risk of disclosure of protected materials and the appearance of unfairness, and would certainly chill essential communications that the privileges are designed to protect. The defense urges the Court to adopt the former.

Dated: June 11, 2025

By:     */s/ Steven L. Barth*
STEVEN L. BARTH
Assistant Federal Public Defender
Office of the Federal Public Defender
District of Vermont
95 Pine Street, Suite 150
Burlington, Vermont 05401
Phone: (802) 862-6990
Email: Steven_Barth@fd.org
Counsel for Teresa Youngblut
