UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cr-00015-cr-1 |
| | ) | |
| TERESA YOUNGBLUT, | ) | |
| Defendant. | ) | |

**MOTION TO EXTEND THE DEADLINE TO PRESENT MITIGATING AND OTHER EVIDENCE TO THE ATTORNEY GENERAL'S CAPITAL CASE REVIEW COMMITTEE**

NOW COMES Defendant, Teresa Youngblut, through counsel, and respectfully requests that the Court extend the deadline to present mitigating and other evidence to the Attorney General's Capital Case Review Committee. The defense also requests that the Court hear oral argument on this motion.

**I.     Introduction**

On February 6, 2025, Teresa Youngblut was indicted on charges of assault on a federal officer and discharging a firearm in connection with a crime of violence. On June 2, 2025, the government informed defense counsel that they should be prepared to meet with the Attorney General's Capital Case Review Committee on July 28, 2025. Per the Department's internal guidebook for federal prosecutors, such a meeting is intended to allow the defense to present any mitigating evidence that it believes may bear on the government's decision whether to seek the death penalty against a defendant charged with potentially capital crimes. *See* U.S. Dep't of Justice, Justice Manual § 9-10.080 ["Justice Manual"] (laying out the process by which the Capital Case Review Committee receives information from defense counsel and makes a recommendation to the attorney general). The government's imminent July 28th deadline is highly irregular in several respects.

1

For one, the government has not yet obtained a capital indictment, which ordinarily precedes by many months a defendant's deadline to submit mitigation evidence. For another, the timeline being imposed in this case is vastly out of step with the historical practice of the Department of Justice, which has, on average over the past 15 years, provided nearly 15 months between the filing of a death-eligible indictment and the deadline for a mitigation submission.[1] The unprecedentedly tight timeline is even more untenable because it is only in the last two and a half weeks that Ms. Youngblut's defense team has secured the assistance of "learned counsel," whose special expertise in capital litigation is essential to compiling a mitigation presentation. And, irregularities aside, the government's schedule promises to turn Ms. Youngblut's submission into a near-pointless formality. Given the time-intensive and laborious nature of building a mitigation case, the July 28th deadline will prevent the defense from submitting even a minimally adequate mitigation presentation to the government.

This Court should step in to ensure Ms. Youngblut receives a meaningful opportunity to persuade the government not to pursue the death penalty. A meeting at which a defendant presses her argument for a non-capital sentence "can literally lead to a determination of life or death," and some courts have therefore held it represents "a 'critical' stage of a criminal proceeding" at which "the Sixth Amendment right to counsel attaches." *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 87 (D.P.R. 2003); *cf. Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016) ("[T]here can be no doubt that the decision to pursue the death penalty is a critical choice in the adversary process. Indeed, after a defendant is charged with a death-eligible crime, whether to ask a jury to end the defendant's life is one of the most serious

---

[1] This nearly 15-month average excludes cases originating from a murder by an inmate already serving a sentence in a Bureau of Prisons (BOP) facility.

discretionary decisions a prosecutor can be called upon to make."). Presumably for that reason, the Judicial Conference of the United States has directed district courts in capital cases, after appointment of learned counsel, to set a schedule "for resolution of whether the government will seek the death penalty." Judicial Conference, *Guide to Judiciary Policy,* Vol. 7, Pt. A, Ch. 6, § 670(a). That schedule, according to the Judicial Conference, should include a date for "the submission by the defendant to the [government] of any reasons why the government should not seek the death penalty," "should be flexible and subject to extension for good cause," and it must "allow reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought." *Id.* § 670(b)(1), (c) and (d).[2] Consistent with that guidance, some courts have ordered the government to extend a defendant's submission deadline when a government-imposed timeline leaves the defendant with inadequate time to put together a mitigation presentation. *See United States v. McGill*, 2010 WL 1571200 (S.D. Cal. Apr. 16, 2010); *United States v. Carrillo*, 2020 WL 6591198 (N.D. Cal. Nov. 11, 2020); *United States v. Benavides*, 2008 WL 11638169 (D. Mont. Oct. 21, 2008).

In light of the unusually rushed deadline imposed by the government in Ms. Youngblut's case, this Court should do the same. Ms. Youngblut therefore moves the Court for an order directing the government to (1) extend the deadline for her Department of

---

[2] *See also* Am. Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.9.1 cmt., at 84 (revd. 2003) ["ABA Guidelines"] ("In many jurisdictions, the prosecution will consider waiving the death penalty after the defense makes a proffer of the mitigating evidence that would be presented at the penalty phase and explains why death would be legally and/or factually inappropriate. In some states and the federal government, this process is formalized and occurs before a decision is made whether to seek the death penalty. . . . [T]he mitigation investigation is crucial to persuading the prosecution not to seek death.").

Justice submission by at least six months, and (2) refrain from making a decision about whether to seek the death penalty until the Capital Review Committee has reviewed the materials she submits.[3]

## II. Procedural background

Teresa Youngblut is charged by indictment with (1) one count of using a deadly weapon to assault a federal law-enforcement officer while he was engaged in, and on account of, his performance of his official duties, under 18 U.S.C. § 111(a)(1), (b); and (2) one count of discharging a firearm during and in relation to a crime of violence, under 18 U.S.C. § 924(c)(1)(A)(iii). ECF 30 at 1-2. The charges arose out of a confrontation with United States Border Patrol agents on January 20, 2025. *See* ECF 5-1 at 2. According to a complaint sworn out by Federal Bureau of Investigation Agent Leah Bogdanowicz, Border Patrol agents in Coventry, Vermont, stopped a Toyota Prius around 3:00 that afternoon to conduct an immigration inspection. ECF 5-1 at 2-3. After agents ordered Ms. Youngblut, who was driving the Prius, to exit the car, she allegedly drew a handgun and fired toward a Border Patrol agent without warning. ECF 5-1 at 3. The Prius' front passenger, Felix Bauckholt, also allegedly attempted to draw a firearm. ECF 5-1 at 3. In response, at least one Border Patrol agent fired his service weapon at Ms. Youngblut and Mr. Bauckholt. ECF 5-1 at 3. The exchange of gunfire left both Mr. Bauckholt and Border Patrol Agent David Maland dead. ECF 5-1 at 3.

Ms. Youngblut was arrested that day and charged by complaint on January 22, 2025. ECF 5 at 1. Two days later, the Court appointed the Office of the Federal Public Defender to

---

[3] Most courts have concluded they lack authority to order such relief, even as they criticize the government for unnecessarily rushing the seek/no-seek process. For the reasons explained below, however, the Court should part ways with those courts.

represent Ms. Youngblut, ECF 13, and the office assigned the case to Assistant Federal

Public Defender Steven Barth, ECF 18.

On February 5, 2025, Attorney General Pam Bondi issued a memorandum "strongly

encourag[ing]" Department of Justice employees to seek the death penalty in federal capital-

eligible cases.[4] The attorney general's memorandum instructed that, "[a]bsent significant

mitigating circumstances, federal prosecutors are expected to seek the death penalty in cases

involving the murder of a law-enforcement officer."[5] As an example of such a case, the

memorandum referenced "the recent murder of U.S. Customs and Border Patrol agent David

Maland during a traffic stop in Vermont."[6] The grand jury returned its indictment against

Ms. Youngblut the next day, on February 6, 2025. ECF 30.

Given the potential for this case to turn capital, Ms. Youngblut promptly moved the

Court for the appointment of learned counsel. *See* 18 U.S.C. § 3005 ("Whoever is indicted

for treason or other capital crime shall be allowed to make his full defense by counsel; and

the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon

the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law

applicable to capital cases."). The Court granted that motion. For reasons previously

explained to the Court, learned counsel was not available to do any work on the case and

subsequently filed a motion to withdraw for reasons that were unknown to defense counsel at

the time they filed the motion for appointment, and were outside of defense counsel's

--------

[4] Pam Bondi, Memorandum for all Department Employees, "Reviving the Federal
Death Penalty and Lifting the Moratorium on Federal Executions," at 2 (Feb. 5, 2025),
*available at* https://www.justice.gov/ag/media/1388561/dl.

[5] *Id.*

[6] *Id.*

control. The defense then immediately began searching for new learned counsel to take her

place. On June 11, 2025, the defense filed a motion for appointment of new learned counsel,

which this Court promptly granted.[7]

Meanwhile, counsel for the government advised defense counsel on April 16, 2025,

that the defense needed to submit mitigation information—i.e., reasons not to seek the death

penalty—to the United States Attorney's Office (USAO) within two weeks, by May 7, 2025.

See Justice Manual § 9-10.080 (explaining that if considering capital charges, U.S. attorneys'

offices must permit defense counsel to "present information for the consideration of [the

government] which may bear on the decision whether to seek the death penalty"). Any

information submitted after that deadline, the USAO warned, would not be included in the

USAO's submission to Department of Justice's Capital Case Section in advance of an

anticipated superseding indictment on death-eligible charges. After defense counsel

explained that they needed additional time to submit mitigating information, the government

extended the deadline by one week. Although the defense team at that time lacked both

learned counsel and a mitigation specialist, defense counsel did submit a brief letter to the

government on May 14, 2025.

_____

[7] Even in ordinary circumstances, the stringent standards for appointment of learned counsel can make it difficult to find attorneys qualified to fill that role. The Judicial Conference of the United States, for example, advises that learned counsel "should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high-quality representation." Judicial Conference, Guide to Judiciary Policy, Vol. 7A, Ch. 6, § 620.30(b)(2). In Ms. Youngblut's case, locating learned counsel was more challenging than usual. Each learned counsel can work on only a limited number of cases, and since January of this year the number of potentially capital cases in federal court has increased substantially. The result is that fewer learned counsel are available to join federal capital teams than they would be otherwise. Under the circumstances, Ms. Youngblut's defense team moved the Court for appointment of new learned counsel as quickly as reasonably possible.

On June 2, 2025, government counsel advised the defense that the Capital Case Section was offering the defense an opportunity to meet on or before August 1, 2025. This meeting, to be held via video conference, was described as an opportunity for the defense team to present any reason or reasons why the death penalty should not be sought if a death-eligible superseding indictment is returned. Shortly thereafter, the government scheduled that meeting for July 28, 2025, with any written submission by the defense due in advance. On June 19, 2025, defense counsel submitted to the government a written request for an extension of time to present this critical submission. *See* Exhibit A attached hereto (Letter from Steven Barth to AUSA Matthew Lasher). Government counsel rejected the defense request on June 23, 2025. This motion follows.

### III.    Legal background

#### A.  The Federal Death Penalty Act

Federal capital cases are governed by the Federal Death Penalty Act (FDPA). *See United States v. Quinones*, 313 F.3d 49, 52 (2d Cir. 2002). Under the FDPA, a defendant convicted of a death-eligible crime proceeds to a separate sentencing hearing at which the jury determines whether "imposition of a sentence of death is justified." 18 U.S.C. § 3591(a). At the first stage of the penalty phase, the government must prove, beyond a reasonable doubt, at least one of the four "intent factors" enumerated in 18 U.S.C. § 3591(a)(2). *United States v. Fell*, 2017 WL 10809987, at *1 (D. Vt. June 19, 2017). Those factors, which are designed to ensure the defendant had a sufficiently culpable mental state, include, e.g., a finding that the defendant "intentionally killed the victim" or "intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act." § 3591(a)(2).

If the government carries that initial burden, then at stage two of the penalty phase jurors weigh "mitigating factor[s]" and any "aggravating factors for which notice has been given" by the government, including but not limited to certain factors specifically identified in the FDPA. § 3592(a), (c). The jury's task is to decide whether "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." *Id.* § 3593(e).

Prosecutors may not present evidence of an aggravating factor unless the government has previously provided the defendant with "notice" of that factor. *Id.* § 3593(c). They do so through a "notice of intent." *United States v. Pepin*, 514 F.3d 193, 198 (2d Cir. 2008). If prosecutors believe "death is justified," they must, "a reasonable time before the trial . . ., sign and file with the court, and serve on the defendant, a notice" that the government intends to seek the death penalty. *Id.* § 3593(a). This notice of intent must "set[] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death." § 3593(a)(2); *see United States v. Jacques*, 684 F.3d 324, 326 (2d Cir. 2012).

### B. The Justice Manual

The "Capital Crimes" portion of the Justice Manual, the Department of Justice's guidebook for federal prosecutors, describes "the policies and procedures for all Federal cases in which a defendant is charged, or could be charged, with an offense subject to the death penalty." Justice Manual § 9-10.010. Specifically, that section lays out a "review process" for deciding whether the government should seek death, which includes an opportunity for defense counsel to meet with the Department of Justice and advocate for a

"no seek" decision. This "capital punishment certification hearing . . . is of paramount importance," as it "can literally lead to a determination of life or death." *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 87 (D.P.R. 2003). As a result, some courts have held the pre-authorization meeting with the Department of Justice is "a 'critical' stage of a criminal proceeding" at which "the Sixth Amendment right to counsel attaches." *Id.* That meeting is especially critical in Ms. Youngblut's case. As explained above, Attorney General Bondi has made clear that unless "significant mitigating circumstances" are present, the government will seek death against defendants, such as Ms. Youngblut, who are charged with killing law-enforcement officers.[8] The process laid out in the Justice Manual therefore represents Ms. Youngblut's best, and perhaps only, opportunity to convince the government to seek a non-death sentence.

According to the Justice Manual, a local United States Attorney who "is contemplating requesting authorization to seek the death penalty . . . shall give counsel for the defendant a reasonable opportunity to present information . . . which may bear on the decision whether to seek the death penalty." *Id.* § 9-10.080. After "a reasonable period of time" has passed, the United States Attorney "shall submit to the Assistant Attorney General for the Criminal Division through the Capital Case Section his or her recommendation whether to seek the death penalty, along with [certain] materials" prescribed in the Manual. *Id.* Among other things, the United States Attorney's recommendation must include (1) a "[d]eath penalty analysis" that "identif[ies] applicable threshold intent factors under 18 U.S.C. § 3591, applicable statutory aggravating factors under 18 U.S.C. §§ 3592(b)-(d), and

---

[8] Bondi, Memorandum for all Department Employees, at 2.

applicable mitigating factors under 18 U.S.C. § 3592(a)"; and (2) "[a]ny documents or materials provided by defense counsel to the United States Attorney . . . in the course of the United States Attorney's Office's . . . death penalty review process." *Id.* § 9-10.080(A)(4), (B)(F).

The United States Attorney's recommendation is sent to the Capital Review Committee, a group of attorneys drawn from the Office of the Deputy Attorney General, the Office of the Assistant Attorney General for the Criminal Division, and various United States Attorneys' offices. *See id.* § 9-10.130. If the local United States Attorney recommends seeking death, or if two or more Committee members "request a . . . conference," the Committee "establish[es] a date and time for the Capital Review Committee to meet with defense counsel and representatives of the United States Attorney's Office . . . to consider the case." *Id.* The Committee then "review[s] the materials submitted by the United States Attorney . . . and any materials submitted by defense counsel" and "make[s] a recommendation to the Attorney General through the Deputy Attorney General" as to whether the government should seek the death penalty. *Id.* According to the Justice Manual, "[n]o final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation." *Id.* "The Attorney General will make the final decision whether the Government should file a notice of intent to seek the death penalty." *Id.*

At each step of this process, government lawyers—the United States Attorney, the Capital Review Committee, the Deputy Attorney General, and the Attorney General—assess "whether the applicable statutory aggravating factors and any non-statutory aggravating factors sufficiently outweigh the applicable mitigating factors to justify a sentence of death

or, in the absence of any mitigating factors, whether the aggravating factors themselves are sufficient to justify a sentence of death." *Id.* § 9-10.140(C).

## IV.  Argument

The Court should (1) extend the deadline for Ms. Youngblut to make her no-seek submission to Department of Justice until at least January 30, 2026, and (2) order the government to refrain from making a decision about whether to seek the death penalty until the Capital Review Committee has reviewed the materials submitted by defense counsel. The requested extension is necessary to ensure that Teresa Youngblut is provided a meaningful opportunity to compile a preliminary mitigation presentation for the government to consider as it considers whether to seek a sentence of death.

### A.  An extended deadline is necessary to protect the integrity of the death-authorization process.

District courts have inherent power to set deadlines and enter scheduling orders that govern the pace at which litigation must proceed. *See, e.g.*, *Culpepper v. Bank of Am., Nat'l Ass'n*, 2019 WL 343253, at *1 (D. Conn. Jan. 28, 2019); *Hill v. Griffin*, 2018 WL 5078255, at *2 (W.D.N.Y. Oct. 18, 2018); *United States v. W.R. Grace*, 526 F.3d 499, 508-09 (9th Cir. 2008). The Court should exercise its inherent authority in this case to (1) set a deadline no earlier than January 30, 2026, by which Teresa Youngblut may submit mitigation and other materials to the Capital Review Committee, and (2) direct the government to refrain from making a decision whether to seek the death penalty until the Committee has reviewed the defense submission.

The Judicial Conference of the United States has blessed district courts' use of such deadlines. In guidelines governing implementation of the Criminal Justice Act, the Conference has instructed that "[w]ithin a reasonable period of time after appointment of

counsel" in a capital case, a district court "should establish a schedule for resolution of whether the government will seek the death penalty." Judicial Conference, *Guide to Judiciary Policy*, Vol. 7A, Ch. 6, § 670(a). The schedule "should include dates for . . . the submission by the defendant to the U.S. attorney of any reasons why the government should not seek the death penalty," as well as for submission of the United States Attorney's recommendation to Main Justice. *Id.* § 670(b)(1)-(2). And, consistent with the gravity of the seek/no-seek decision, the "schedule should allow reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought." *Id.* § 670(d).

A scheduling order like that contemplated by the Judicial Conference is necessary to ensure the "orderly . . . disposition" of Ms. Youngblut's case. *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d at 487. The present timeline, which requires a defense submission no later than July 28, 2025, is highly irregular. For one thing, the government set a deadline before the grand jury has even returned a capital indictment. From speaking with resource counsel, who have decades of experience in federal capital litigation, it is the defense's understanding that the government has virtually never taken that course except in cases involving a murder inside the Bureau of Prisons.[9] Imposing a deadline pre-capital-indictment in Ms. Youngblut's case therefore marks a dramatic break from ordinary procedure.

Relatedly, the government's July 28th deadline leaves Ms. Youngblut with far less time than federal capital defendants typically receive to build their mitigation presentations.

---

[9] Because of considerations unique to already-sentenced defendants accused of committing murders in a BOP facility, an indictment often is not returned until several years after the crime has occurred.

Since 2010, "[t]he average number of months between capital eligible indictment and the [Capital Case Review Committee] meeting for defendants that do not involve a reconsideration of a previous government 'no seek' decision (cases in which the Department of Justice during the Biden administration had previously decided not to pursue the death penalty) is 14.9 months." Exhibit B at 2, attached hereto (Declaration of Matthew Rubenstein, Director of the Capital Resource Counsel Project).[10] Here, the government has yet to file a capital indictment. If it obtained a superseding indictment tomorrow, the time between capital indictment and Ms. Youngblut's meeting with the Capital Review Committee would amount to less than a month. Ms. Youngblut cannot predict how much time will pass between her meeting with the Committee and the Committee's seek/no-seek decision. But even if the Committee took unusually long—e.g., six months—to make its decision, the capital-indictment-to-authorization window in Ms. Youngblut's case would still be just seven months, well below the 14.9-month average.

It is for good reason that the government typically affords defendants substantially more than one month to assemble a mitigation case. As the American Bar Association (ABA) has explained, building a constitutionally adequate mitigation case is "a time-consuming task." ABA Guidelines at 83. The sentencing jury in a capital case must consider, in mitigation, "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant." *Id.* at 81. Preparing a mitigation presentation therefore "requires extensive and generally unparalleled investigation into

---

[10] The average does not include those cases in which the defendant died before indictment, there is no known meeting with the Capital Review Committee, and cases where the meeting took place prior to indictment. As described above, the latter category historically have been confined to cases in which there was a murder by an inmate within a BOP facility.

personal and family history." *Id.* Among other things, the ABA advises that the defense

"needs to explore" the following:

- "Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage)."

- "Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities)."

- "Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities."

- "Military service (including length and type of service, conduct, special training, combat exposure, health and mental health services)."

- "Employment and training history (including skills and performance, and barriers to employability)."

- "Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services)."

*Id.* at 81-82.

Investigating these aspects of a defendant's life requires obtaining and then carefully

studying numerous documents, e.g., "school records," "social service and welfare records,"

"juvenile dependency or family court records," and many more. *Id.* at 84. The defense must

also "locate and interview the client's family members . . . and virtually everyone else who

knew the client and [her] family, including neighbors, teachers, clergy, case workers,

doctors, correctional, probation or parole officers, and others." *Id.* at 83. Finally, the defense

must, of course, speak with the defendant herself about her experiences—a process that

requires the defense to spend time building trust and rapport with their client. *See id.* at 82.

Ms. Youngblut does not claim that, before making a submission to the Capital Review Committee, she must be given enough time to conduct an exhaustive mitigation investigation, i.e., one as thorough as the investigation she will complete before trial. But even a preliminary mitigation investigation requires gathering and synthesizing a wide range of information—substantially more than the defense can locate in a month. Thus, the current deadline is nowhere near adequate. Without additional time, therefore, Ms. Youngblut's mitigation presentation has no realistic chance of serving its purpose. *See United States v. Constanza-Galdomez*, 2025 WL 1712436, at *1 (D. Md. June 18, 2025) ("Preparing a mitigation case, even for use in those initial pre-authorization stages, requires a complete investigation of the defendant's life circumstances and generally involves hiring mitigation experts.").

Several additional factors demonstrate the inadequacy of the current deadline.

***First,*** until just weeks ago, Ms. Youngblut enjoyed essentially no representation from counsel "learned in the law applicable to capital cases." § 3005. AFPD Steven Barth, the attorney initially appointed to Ms. Youngblut's defense team, has no experience in capital cases. Although the Court appointed learned counsel in February 2025, she was unable to devote any time or attention to Ms. Youngblut's case because of a previously scheduled trial in another case. Learned counsel subsequently withdrew from Ms. Youngblut's case, and new learned counsel was not secured until June 12, 2025.

The lack of learned counsel for almost the entirety of this case has hamstrung the defense team's ability to prepare a mitigation case. Learned counsel are required to possess "skill in the investigation, preparation, and presentation of mitigating evidence" that most

attorneys lack. ABA Guidelines 5.1(B)(2)(g). Under the ABA Guidelines, therefore, it is learned counsel who "bears overall responsibility for the performance of the defense team," including "selecting and making any appropriate contractual agreements with . . . [a] mitigation specialist." *Id.* 10.4(B), (C)(2)(a). Once a mitigation specialist is in place, learned counsel directs and oversees the specialist's mitigation investigation. And learned counsel is responsible for finding and retaining a team member "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments," which can be crucial in developing a mitigation case. *Id.* 10.4(C)(2)(b). In the absence of learned counsel, therefore, Ms. Youngblut's defense team was until very recently unable to begin its mitigation investigation in earnest.

**Second,** and relatedly, Ms. Youngblut's defense team has only just obtained the assistance of a mitigation specialist. One of the early responsibilities of learned counsel is helping to identify a qualified mitigation specialist.

A mitigation specialist is no mere luxury in capital cases. In addition to "no fewer than two attorneys" and "an investigator," the ABA recommends that the "defense team should consist of . . . a mitigation specialist," ABA Guidelines 4.1(A)(1), at 28, and use of mitigation specialists "has become part of the existing standard of care in capital cases, ensuring high quality investigation and preparation of the penalty phase," *id.* at 33. Mitigation specialists "possess clinical and information-gathering skills and training that most lawyers simply do not have," and they "have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf." *Id.* Using these skills, mitigation

16

specialists "compile[] a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyze[] the significance of the information in terms of impact on development, including effect on personality and behavior; find[] mitigating themes in the client's life history; identif[y] the need for expert assistance; assist[] in locating appropriate experts; provide[] social history information to experts to enable them to conduct competent and reliable evaluations; and work[] with the defense team and experts to develop a comprehensive and cohesive case in mitigation." *Id.* In short, mitigation specialists are "indispensable member[s] of the defense team throughout all capital proceedings," *id.*, and Ms. Youngblut's defense team was not able to retain one until the last two weeks.

*Third,* the conditions of Ms. Youngblut's confinement have made it difficult for the defense team to elicit potential mitigation information from her. Until last week, Ms. Youngblut was being detained at a facility which is more than two hours (one way) from the Federal Defender office in Burlington, Vermont. Given the time required to travel to the facility, the defense has been able to conduct only a limited number of client visits with Ms. Youngblut. The result is that the process of exploring mitigation information—already laborious and time-consuming—has been slowed even further.

Faced with similar concerns, some courts have directed the government to permit capital defendants extra time to make their mitigation presentations to the Department of Justice. Setting "a date for the [defendant's] mitigation presentation" to the Department of Justice "avoid[s] any risk that the Defendants will be put at a disadvantage" while also "achiev[ing] the efficient and just resolution" of the seek/no-seek decision. *Benavides*, 2008 WL 11638169, at *2-3. And, as these courts have emphasized, entering such a scheduling

17

order does not "prejudice" the government in any way. *Id.* at *3; *see also Carrillo*, 2020 WL
6591198, at *3 ("As in *McGill*, the 'government has not shown how a brief delay in the
defendant's presentation of mitigation evidence to the U.S. Attorney will hinder its ability to
carry out its prosecutorial function.'" (quoting 2010 WL 1571200, at *4)).

These courts also recognize that "an artificial rush" in the authorization process may
end up "backfir[ing]." *See Carrillo*, 2020 WL 6591198, at *3. Under the current deadline, it
is unavoidable that the defense will miss significant pieces of mitigating evidence that should
be relevant to the seek/no-seek decision. Indeed, whole areas of potential mitigation are
likely to go completely unexplored between now and July 28th, and thus information
relevant to those topics will not be before the Capital Review Committee as it considers Ms.
Youngblut's case. When, inevitably, additional mitigating information comes to light later,
Ms. Youngblut may "request the withdrawal of the notice of intention to seek the death
penalty" in light of that new information, *United States v. James*, No. 8:18-cr-333-BCB-
SMB, ECF 84 at 7 n.5 (D. Neb. Apr. 4, 2019), as the Justice Manual expressly permits, *see*
Justice Manual § 9-10.160(B) (describing mechanism for defendant to "request . . .
withdrawal of a notice of intention to seek the death penalty"). Ms. Youngblut's request
"would require that the committee that made the original decision approving the death
penalty request to be re-convened to hear any evidence it previously did not consider, which
would necessitate a stay of this case and a delay of the trial until the Committee makes a
decision on the request." *James*, 8:18-cr-333-BCB-SMB, ECF 84 at 7 n.5; *see* Justice
Manual § 9-10.160(B) (explaining that when defendant submits request to withdraw notice of

intent, the Capital Review Committee reconvenes and makes a new recommendation to the Attorney General, who must then approve or reject it).[11]

Ms. Youngblut recognizes that many courts have concluded they lack authority to set a deadline by which defendants are entitled to submit mitigating information to the Department of Justice. According to these courts, which represent a majority view, issuing such a scheduling order would "encroach on the central prerogatives" of the executive branch and therefore violate the separation of powers. *United States v. Slone*, 969 F. Supp. 2d 830, 836-37 (E.D. Ky. 2013). These courts, even while concluding that "insistence on" the government's submission deadline "does not represent an efficient use of time and resources," have therefore declined to extend government-set deadlines for submitting mitigation material. *E.g.*, *United States v. Wilson*, 518 F. Supp. 3d 678, 682 (W.D.N.Y. 2021). Ms. Youngblut acknowledges these courts' conclusions but respectfully believes their reasoning does not apply in a case, such as this one, where the government has put the authorization process on such an extraordinarily rushed timeline. In none of those cases—at least as far as Ms. Youngblut is aware—did the government require mitigating evidence to be submitted just six weeks after the appointment of learned counsel, in a case in which the

---

[11] As explained above, Ms. Youngblut does not request as much time as it would take to conduct a complete mitigation investigation before meeting with the Capital Review Committee. She recognizes that the mitigation investigation defendants conduct ahead of that meeting is necessarily preliminary, and it is likely true in most cases that the defense later discovers at least some additional mitigating evidence after making its submission to the Committee. What is different in this case is how radically inadequate the current timeline is. Faced with a July 28th deadline, the defense is bound to overlook not just a few isolated pieces of mitigating evidence, but whole areas of Ms. Youngblut's life that may ultimately prove fertile sources of mitigation. In this case, unlike in most cases, the amount of mitigating evidence that comes to light after the Committee meeting will almost certainly dwarf whatever fragments of mitigation the defense is able to unearth in the next four weeks.

defendant has not even been charged in a capital indictment. Cases like *Slone* and *Wilson* do not address cases in a posture as irregular as Ms. Youngblut's.

Even the Department of Justice, in its institutional role, has recognized that capital defendants should have "a reasonable opportunity to present information for the consideration of the [government] which may bear on the decision whether to seek the death penalty." Justice Manual § 9-10.080. That provision is consistent with the capital review process' "overriding goal," which is "to allow proper individualized consideration of the appropriate factors relevant to each case." *Id.* § 9-10.030. But on the current schedule, Ms. Youngblut's opportunity to present information to the Capital Review Committee is not "reasonable." *Id.* § 9-10.080. As explained above, Ms. Youngblut has only just begun its mitigation investigation now that learned counsel has been appointed, and a mitigation specialist identified and retained. And if the Committee "does not have a defendant's mitigation evidence, then it cannot consider all of the appropriate factors relevant to each case." *Schlesinger*, 2019 WL 11853370, at *2.

## V.    Conclusion

For the reasons described above, the Court should (1) extend the deadline for Ms. Youngblut to make her no-seek submission to the Capital Case Review Committee until at least January 30, 2026, and (2) order the government to refrain from making a decision about whether to seek the death penalty until the Capital Review Committee has reviewed the materials she submits. The defense respectfully requests that oral argument be heard on this motion.

Dated: June 30, 2025

By:     */s/ Steven L. Barth*
        STEVEN L. BARTH
        Assistant Federal Public Defender
        Office of the Federal Public Defender
        District of Vermont
        95 Pine Street, Suite 150
        Burlington, Vermont 05401
        Phone: (802) 862-6990
        Email: Steven_Barth@fd.org

        */s/ Julie L.B. Stelzig*
        JULIE L.B. STELZIG
        Assistant Federal Public Defender
        6411 Ivy Lane, Suite 710
        Greenbelt, Maryland 20770
        (301) 344-0600
        (301) 344-0019 (FAX)
        Email: julie_stelzig@fd.org

        Counsel for Teresa Youngblut