UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 2:25-cr-00015-1 |
| ) | |
| TERESA YOUNGBLUT, ) | |
| Defendant. ) | |

**RESPONSE OF THE UNITED STATES IN OPPOSITION TO
DEFENDANT'S MOTION TO EXTEND THE DEADLINE TO PRESENT MITIGATING
AND OTHER EVIDENCE TO THE ATTORNEY GENERAL'S
CAPITAL CASE REVIEW COMMITTEE**

NOW COMES the United States of America (hereinafter, "the government" or "the United States") by and through its counsel, Michael P. Drescher, Acting United States Attorney for the District of Vermont, and David L. Jaffe, Chief of the Department of Justice Violent Crime and Racketeering Section, and responds in opposition to the motion of defendant Teresa Youngblut (hereinafter, "the defendant") titled as *Motion to Extend the Deadline to Present Mitigating and Other Evidence to the Attorney General's Capital Case Review Committee* (the "Motion"). (Doc. 80.)  In the Motion, the defendant asks the Court to order the government to extend the defendant's deadline to submit mitigation material in this case to January 30, 2026, and to direct the government to refrain from "making a decision whether to seek death until the Capital Case Review Committee has reviewed the materials she submits." (Doc. 80 at 3, 11, 20.) The defendant asks this Court to "step in[,]" (*id.* at 2), to what is an exclusively Executive function – a decision on whether to pursue a potential charge that is eligible for the death penalty and whether to seek the death penalty in such a case. To grant the defendant the relief requested in the Motion, would constitute an injunction prohibiting the United States from moving forward with an internal decision-making process of the Executive Branch and would intrude upon its independent

prosecutorial discretion. While conceding that the vast majority of courts have determined that they lack the authority to interfere in such internal deliberative processes, the defendant urges the Court to nevertheless use its "inherent authority", (*id.* at 11), and interject itself into the Executive Branch's internal capital-review process.

First, as set forth below, the government's timings for scheduling a mitigation presentation to the United States Attorney and the Capital Case Section of the Department of Justice are beyond this Court's purview because those deadlines relate only to an Executive Branch internal deliberation. Were the Court to grant the defendant's request, the Court would violate separation-of-powers principals and infringe on the Executive Branch's exclusive prosecutorial discretion in deciding whether charge a death eligible offense or to seek the death penalty in this case. Second, the government's capital review is an internal process in which the defendant has no cognizable right to participate beyond the Executive Branch's invitation. Third, the capital review process does not rise to the legal definition of a "critical stage" in this criminal prosecution and thus does not implicate any Sixth Amendment right to the effective assistance of counsel. For these reasons, which are discussed more fully below, the United States requests that this Court deny the defendant's motion without oral argument.[1]

## BACKGROUND

### I.  Procedural Background

On January 20, 2025, United States Border Patrol agents encountered Youngblut during a vehicle stop to, at least in part, conduct an immigration inspection in Orleans County, Vermont. During the vehicle stop, defendant Youngblut, the driver of the vehicle, drew and fired a handgun

---

[1] Because there is no factual dispute requiring the presentation of evidence, the Court need not receive oral arguments from the parties.

toward at least one of the uniformed Border Patrol agents. In response, at least one Border Patrol agent returned fire with his service weapon. The exchange in gunfire resulted in fatal injuries to Border Patrol Agent David Maland, who was transported to North County Hospital for emergency care but was subsequently pronounced deceased.

On January 22, 2025, federal agents arrested Youngblut on a federal criminal complaint, charging Youngblut with assaulting a federal officer with a deadly weapon, in violation of 18 U.S.C. § 111, and carrying, brandishing, and discharging a firearm during and in relation to that assault, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). (Doc. 5.) On January 27, 2025, Youngblut made an initial appearance before the Court on January 27, 2025, (Doc. 22), and was ordered to be detained in the custody of the United States Marshal following a detention hearing on January 30, 2025, (Doc. 28.) On February 6, 2025, a federal grand jury returned a two-count indictment, charging Youngblut with the same offenses outlined in the criminal complaint.[2] (Doc. 30.)

On January 24, 2025, the Court appointed the Office of the Federal Public Defender to represent Youngblut, and Assistant Federal Public Defender Steven Barth then entered his notice of appearance on that same date. (Docs. 13, 18.) Counsel for the defendant, in anticipation of a potential capital prosecution, promptly applied to the Court for the appointment of learned counsel in or around February 2025. (Doc. 80 at 5, 15) The Court granted the defendant's request and appointed learned counsel. *Id.*

On April 16, 2025, the United States told defense counsel it would be submitting a memorandum to the Department of Justice's Capital Case Section (CCS) for review and requested

---

[2] The defendant is not presently charged with a violation constituting a capital crime. The United States acknowledges the reference in the Attorney General's memorandum of February 5, 2025, to the death of the United States Border Patrol agent does involve this case. The investigation into the circumstances of the agent's death is ongoing, and the United States acknowledges that additional or alternative charges could be sought in a superseding indictment.

defense counsel submit, no later than May 7, 2025, mitigation information to the United States Attorney's Office ("USAO") for incorporation into the government's submission to the CCS. On April 23, 2025, defense counsel requested additional time to submit mitigation information to the government. The USAO agreed to extend the deadline to May 14, 2025. Counsel for the defendant provided mitigation information to the government on May 14, 2025, and the USAO incorporated the information in its correspondence with CCS.

On June 2, 2025, the United States provided defense counsel the opportunity to meet with the Attorney General's Review Committee on Capital Cases (or "Capital Review Committee") to present mitigation to the government on any date prior to August 1, 2025, and it invited defense counsel to propose dates within that range. Defense counsel did not respond with proposed dates before the United States advised defense counsel on June 18, 2025, that CCS scheduled the meeting for July 28, 2025. On June 19, 2025, defense counsel requested delaying the July 28, 2025, meeting. The prosecution team, upon advisement from CCS, declined to reschedule the meeting. Defense counsel thereafter filed the instant Motion on June 30, 2025, (Doc. 80), asking the Court to intervene.

**II.     The Decision-Making Process in a Death-Eligible Case**

The Department of Justice ("DOJ") maintains a Justice Manual ("JM") that "publicly sets forth internal [DOJ] policies and procedures." JM §1-1.100. The JM is intended to provide internal guidance for the DOJ. JM § 1-1.200. "It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal." *Id.*

A subpart of the JM describes the recommended internal procedure to be followed in cases in which a defendant is charged, or could be charged, with an offense subject to the death penalty.

JM § 9-10.000.³ The Capital Case Review process "culminates in a decision to seek, or not to seek, the death penalty against an individual defendant…The overriding goal of the review process is to allow proper individualized consideration of the appropriate factors relevant to each case." JM § 9-10.030. The "decision-making process preliminary to the Attorney General's final decision is confidential[,]" except for – in this case – the disclosure of scheduling matters and the level at which a decision is pending within the Department. JM §9-10.050. The JM is DOJ policy, and the procedures outlined in § 9-10.000 are not codified by law or rule. Title 18, United States Code, Sections 3591-3599 sets forth factors that must be considered in seeking death before a tribunal. Section 3593 instructs the government must in "a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant a notice stating that the government believes that…death is justified and that the government will seek death. 18 U.S.C § 3593(a). The notice must also set forth the factor(s) that the government must prove to justify a death sentence. *Id*. Indeed, the statutory scheme does not contemplate any discussion with defense counsel prior to the Attorney General's announcement as to application of the death penalty in any particular case.

Under the DOJ's death penalty protocol ("DPP"), a United States Attorney who is contemplating requesting authorization to seek the death penalty must give defense counsel a reasonable opportunity to present information bearing on the United States Attorney's decision whether to seek the death penalty. JM § 9-10.080. The United States Attorney then submits a prosecution memorandum setting forth its recommendation on whether to seek the death penalty, along with other forms and materials, to the Assistant Attorney General for the Criminal Division.

---

³ Justice Manual | 9-10.000 - Capital Crimes | United States Department of Justice, http://www.justice.gov/jm/jm-9-10000-capital-crimes (last visited July 14, 2025).

JM § 9-10.080. Included in the submission is any mitigation material previously provided by defense counsel to the United States Attorney. *Id*.

To assist in the review process, the JM establishes a Capital Review Committee (CRC) composed of DOJ attorneys. JM § 9-10.130. The CRC reviews the submitted material and makes a recommendation to the Attorney General. *Id*. If a United States Attorney has requested authorization to seek the death penalty, a CCS attorney must request a conference with defense counsel, the CRC, and representatives of the U.S. Attorney's Office or Department component. *Id*. "No final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation." *Id*. The CRC reviews the materials submitted by the United States Attorney and any materials submitted by defense counsel and makes a recommendation to the Attorney General. *Id*. The Attorney General makes the final decision about whether or not to seek the death penalty. JM § 9-10.050.

Even if a notice of an intention to seek the death penalty is authorized, it can be reconsidered and possibly withdrawn. *See* JM § 9-10.160. A defendant can request the withdrawal by first making the request to the United States Attorney. Following the procedure outlined above, the request is submitted to the CRC, who limits its evaluation to determining if the changed facts and circumstances, had they been known at the time of the initial determination, would have resulted in a decision not to seek the death penalty. *Id*. The request is ultimately submitted to the Attorney General for a decision. JM § 9-10.050.

**III.    The Status of the Process in the Present Case**

As acknowledged in the Motion, Youngblut might be, but has not yet been, charged with an offense subject to the death penalty. (Doc. 80.) Here, the United States Attorney "believe[d] it would be useful to the decision-making process to receive a submission from defense counsel,"

JM §9-10.080, so the procedures outlined in the JM are applicable. Following this courtesy notification and voluntary procedure for potential capital-case charging, on April 16, 2025, the USAO requested mitigation information from defense counsel to be submitted on or before May 7, 2025. At the request of defense counsel, the USAO extended the deadline to May 14, 2025. (Doc. 80 at 6.) At that time, counsel for the defendant submitted a letter to the USAO containing mitigation information. *Id*. The USAO then provided the mitigation information to CCS in an internal DOJ memorandum as established by JM 9-10.080. The CCS offered defense counsel "an opportunity to present evidence and argument in mitigation" on July 28, 2025. (Doc. 80 at 7, JM § 9-10.130.) The defendant requested the government delay the July 28 meeting, and the government declined the defendant's request. *Id*. The defendant now asks the Court to "step in" and order the government to "(1) extend the deadline for [the defendant] to make her no-seek submission to the Capital Case Review Committee until at least January 30, 2026, and (2) order the government to refrain from making a decision about whether to seek the death penalty until the Capital Review Committee has reviewed the material submitted by defense counsel." *Id.* at 11.

## **ARGUMENT AND AUTHORITY**

### I.     The Court Should Not Intervene in the DOJ's Internal Procedures Such as the Pre-Authorization Meeting with Defense Counsel

The defendant asks this Court to enter an order preventing the United States from enforcing internal deadlines it has set for capital review in this case. Specifically, the defendant asks the Court to extend the deadline to submit *additional* mitigation information to the Capital Case Review Committee until at least January 30, 2026, and to prevent the government from making a decision about whether to seek the death penalty until the CRC has reviewed the additional material submitted by defense counsel. Despite the defendant's request, the Court's inherent authority must yield to the separation of powers doctrine. Moreover, the capital case review

procedures described in the JM serve as an internal guide only. The JM does not create any rights, substantive or procedural, enforceable by the parties.

### A. The Decision to Seek the Death Penalty is a Unique Exercise of Prosecutorial Discretion Protected by the Separation of Powers Doctrine

In enacting the Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§ 3591–99, Congress broadly provided that the death penalty may be sought for a capital offense when "the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified" and thereafter files, within a reasonable time before a trial or guilty plea, a notice indicating that the United States will seek the death penalty. 18 U.S.C. § 3593(a). Thus, the decision whether to seek the death penalty is an exclusively Executive function. The Supreme Court has noted that the decision "whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's discretion]," so long as it is supported by probable cause. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1968); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996) (decision whether to prosecute rests in government's discretion unless premised on constitutionally prohibited criteria); *United States v. Sanders,* 211 F.3d 711, 717 (2d Cir. 2000) (the decision to charge rests with the prosecutor and is presumed legitimate).

The separation of powers doctrine underscores the need for judicial deference to the prosecutor in the process of performing the "core executive constitutional function" of charging criminal offenses. *See Armstrong*, 517 U.S. at 465 ("Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. . . . It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function"). *See also United States v. Lawrence*, 179 F.3d 343, 347-48 (5th Cir. 1999) ("The broad discretion afforded a prosecutor rests largely on the recognition that the

decision to prosecute is particularly ill-suited to judicial review."). This broad prosecutorial discretion extends to the prosecutor's decision to seek the death penalty. *See United States v. Bass*, 536 U.S. 862, 864 (2002) (summarily rejecting challenge to prosecutor's decision to seek the death penalty).

Regarding the instant motion for the Court to intervene in the government's capital decision-making process, this Court's inherent supervisory powers are limited by the separation of powers doctrine. Generally, this Court may only grant relief if Youngblut can show that the government's complained-of action (here, setting a July 28 meeting for an opportunity for defense counsel to present mitigation information to the CRC) would violate some constitutional provision, statute, or rule. *See United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir. 1985) ("A federal court that imposes sanctions on executive conduct that is otherwise permitted by the Constitution, a federal statute or a rule will most likely be invading the executive sphere rather than protecting itself from invasion. Similarly, the separation-of-powers principle suggests that the creation of a rule by supervisory power can be justified only when a recognized right has been violated.").

Trial courts have repeatedly upheld the separation of powers doctrine by refusing to intervene in the government's death penalty deliberations or processes. For example, in *United States v. Slone*, 969 F. Supp.2d 830 (E.D. Ky. 2013), the district court squarely decided the instant separation of powers question in the government's favor. In *Slone*, the capital defendant moved the court for an order delaying his meeting with the Attorney General's Capital Review Committee by four months. The court declined the defendant's "bid to micromanage the Death Penalty Protocol," concluding that to do so "would violate the Constitution." *Slone*, 96 F. Supp.2d at 836. Citing several Supreme Court precedents, the court explained:

> Courts may not encroach on the central prerogatives of a coequal branch. Slone's motion pits this Court's implied powers against the Executive's constitutionally

>   delegated prosecutorial discretion. When judicial process and executive prerogative conflict, courts must resolve those competing interests in a manner that preserves essential functions of each branch. The separation of powers thus constrains the Court's inherent authority.
>   …
>   Ordering the Justice Department to consider Slone's presentation of mitigating evidence on a particular timeline would obliterate that discretion by imposing judicially-mandated procedures for deciding whether to seek death. Court intervention would interfere with prosecutors' position in our constitutional structure.

*Id*. at 836-38 (internal citations and quotation marks omitted).

Similarly, in *United States v. Tsarnaev*, No. 13-CR-10200-GAO, 2013 WL 5701582, at *1 (D. Mass. Oct. 18, 2013), the government gave the defendant a deadline to provide any "pertinent information or materials" by a certain date. The defendant then asked the court to intervene and order the government to extend the time within which the defendant could provide the requested materials. *Id*. In denying the defendant's request, the court recognized that the death penalty protocol's inclusion of an opportunity for the defendant to submit information and materials for consideration in the Department's internal deliberations was "prudent policy, but is not required by any constitutional, statutory, or decisional rule of law." *Id*. The court further reasoned that the Judicial Conference *Guide to Judiciary Policy* cited by the defendant "was plainly intended to help expedite the government's death penalty decision" – not extend or delay the decision. *Id*. at *2.[4]

As discussed further below, internal DOJ procedures do not confer any enforceable rights on Youngblut, and the defendant has not established that the government's decision to impose a deadline for defense counsel to make an initial mitigation presentation to the CRC violates any

---

[4] The Judicial Conference guidelines, while worthy of consideration, are only "suggestions and recommendations[,]" 28 U.S.C. § 331, and are not binding on courts. *See Hollingsworth v. Perry*, 558 U.S. 183, 193 (2010). As the district court in *Slone* explained, the "Guidelines create no enforceable rights because they were not adopted pursuant to an enabling statute authorizing the Judicial Conference to act with the force of law" and they "assume a power district courts simply do not have." 969 F. Supp. 2d at 835.

specific constitutional provision, statute, or rule. Granting the requested relief would necessarily violate the separation-of-powers doctrine and intrude on the government's prosecutorial discretion and internal deliberative processes. Accordingly, the Court should deny the defendant's motion.

### B. The DOJ's Justice Manual Does Not Create Any Rights, Substantive or Procedural, Enforceable by the Parties

The DPP guides the DOJ's internal charging deliberations and is not justiciable. The JM itself provides:

> The Justice Manual provides internal DOJ guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigation prerogatives of DOJ.

JM § 1-1.200.

Courts that have addressed the issue have consistently held that the JM does not create any substantive or procedural rights enforceable by a defendant. *See*, *e.g.*, *United States v. Feliciano*, 998 F. Supp. 166, 169 (D. Conn. 1998) (finding the JM does not create substantive or procedural rights when the defendant alleged the mitigation provision in the JM entitled them to certain discovery). *See also, e.g.*, *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000) ("it is clear the [JM] does not create any substantive or procedural rights");*United States v. Lopez-Matias*, 522 F.3d 150, 155–56 (1st Cir. 2008) (violation of DPP does not support dismissal of death notice); *United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005) ("Department of Justice guidelines and policies do not create enforceable rights for criminal defendants."); *United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001) (same); *United States v. Crusius*, No. EP-20-CR-389-DCG, 2020 WL 4340550, at *5 (W.D. Tex. July 28, 2020) (same); *Slone*, 969 F. Supp. 2d at 834 (same); *Tsarnaev*, 2013 WL 5701582, at *1 (same); *United States v. Pray*, 764 F. Supp. 2d 184, 188 (D.D.C. 2011) (same); *United States v. Hardrick*, No. 10-CR-202, 2011 WL 2516340, *2

(E.D. La. June 22, 2011) (same); *United States v. Jackson*, No. 04-CR-801, 2006 WL 59559, *2 (S.D.N.Y. Jan. 9, 2006) (same); *United States v. Williams*, 181 F. Supp. 2d 267, 299 (S.D.N.Y. 2001) (same); *United States v. Furrow*, 100 F. Supp. 2d 1170, 1178 (C.D. Cal. 2000) (same); *Shakir*, 113 F. Supp. 2d at 1187 (same); *United States v. McVeigh*, 944 F. Supp. 1478, 1483–84 (D. Colo. 1996) (same); *cf. United States v. Caceres*, 440 U.S. 741 (1979) (finding no application of exclusionary rule to evidence obtained in violation of Internal Revenue Service procedures); *Rinaldi v. United States*, 434 U.S. 22, 29, 31 (1977) (*Petite* policy enforceable only at request of United States); *Sullivan v. United States*, 348 U.S. 170 (1954) (violation of internal requirement to receive departmental approval for submission of tax cases to grand jury did not provide basis to attack grand jury's indictment).

The relief requested by the defendant here, which is essentially an injunction prohibiting the United States from moving forward with its decision-making process on whether to seek the death penalty, would be an unwarranted intrusion into the Executive Branch's prosecutorial discretion of the same ilk as that rejected in *Slone*, 969 F. Supp. 2d at 836–38. The defendant claims that the timeframe contemplated by CCS for the mitigation presentation violates the JM's "reasonable opportunity" provision, but as noted above, those internal procedures create no judicially enforceable rights. As to any possible statutory rights at issue, while the FDPA provides for presentation of mitigation evidence to the jury, *see* 18 U.S.C. § 3592, it is silent on how the "attorney for the government" should go about deciding that "the circumstances of the offense are such that a sentence of death is justified," 18 U.S.C. § 3593(a). There is therefore no statutory source of authority for the defendant's extraordinary request to enjoin an internal process.

## II. The Government's Capital Review Process is Not a "Critical Stage" Giving Rise to the Sixth Amendment Protections

Youngblut claims that the refusal of the United States to delay the July 28, 2025, conference for defense counsel to present mitigation information to the CRC infringes on a constitutional right to the effective assistance of counsel. (Doc. 80 at 2.) In support, the defendant cites to Supreme Court precedent establishing the standards for constitutionally effective counsel in capital cases, as well as the Judicial Conference's *Guide to Judiciary Policy*, which directs district courts to appoint learned counsel and set the performance of capital defense counsel. (Doc. 80 at 2-3.) Notably, none of the cases the defendant cites stands for the proposition that the DOJ's internal review is a "critical stage" in the prosecution, as that term has been defined by federal law, or even that counsel's performance during the capital review process has any bearing on the assessment of counsel's performance. Because the government's capital review processes under the DPP, including a defendant's opportunities to present mitigation information, do not constitute legally recognized "critical stages" at which the Sixth Amendment right to counsel attaches, Youngblut's Sixth Amendment claim must fail.

The Sixth Amendment guarantees all criminal defendants the right "to assistance of counsel for [their] defense." *See* U.S. Const. amend. VI; *see also Johnson v. Zerbst*, 304 U.S. 458 (1938); *Powell v. Alabama*, 287 U.S. 45 (1932). The Supreme Court has held that the accused has the right to effective assistance of counsel at every "critical stage" of a criminal prosecution. *United States v. Wade*, 388 U.S. 218, 224 (1967). But the submission of mitigation information, as described in the DPP, is not a "critical stage" of these proceedings as that term is legally defined.

As a matter of law, a "critical stage" in criminal proceedings is a stage that affects the defendant's right to a fair trial. *Wade*, 388 U.S. at 224, 226. As guaranteed by the Sixth Amendment, a fair trial is one in which "evidence subject to adversarial testing is presented to an

13

impartial tribunal for resolution of issues defined in advance of the proceeding." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). *See also United States v. Pleitez*, 876 F.3d 150 158 (5th Cir. 2017) (explaining that, although neither the Supreme Court nor the Fifth Circuit have delineated all of the critical stages at which a defendant is entitled to the effective assistance of counsel, critical stages include those in which a defendant is "confronting his adversary" and those in which "substantial rights of a defendant may be affected").

Applying these principles, multiple federal courts have concluded that DOJ's capital-review process is not a "critical stage" subject to Sixth Amendment scrutiny. *See*, *e.g.*, *United States v. Shakir*, 113 F. Supp.2d 1182, 1186-91 (M.D. Tenn. 2000) (distinguishing the "administrative, discretionary decision-making process of whether to seek the death penalty" from "judicial proceedings, presided over by a judge," such as sentencing hearings and adult certification hearings, which have been held to be critical stages of a criminal proceeding for purposes of the Sixth Amendment); *United States v. Furrow*, 100 F. Supp. 1170, 1176-77 (C.D. Cal. 2000) (reasoning that the Department's internal death-penalty authorization process is not a critical stage of a criminal proceeding for Sixth Amendment purposes because it "does not affect any of a defendant's substantial rights," "does not reach the merits of the case," and is "fundamentally different" from other proceedings that have been recognized as critical stages inasmuch as it is informal). *But see*, *United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358, 363 (D.P.R. 1999); *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 78 (D.P.R. 2003).

The sound reasoning from those cases can be extended to the instant case. DOJ's capital review processes, including the opportunities for defendants to present mitigation information, are fundamentally different from proceedings that have been deemed "critical stages." The

government's capital review is not a judicial process; rather, it is an internal function of prosecutorial discretion not subject to judicial review. *McVeigh*, 944 F. Supp. at 1483.

Youngblut cites a single case, *Pena-Gonzalez*, 62 F. Supp. 2d 358, 363, which held that the capital case review process is a "critical stage" of the case that gives rise to a Sixth Amendment right to the assistance of counsel. (Doc. 80 at 2.)[5] But that decision, along with another by the same judge, *Gomez-Olmeda*, 296 F. Supp. 2d 71, 78, are the only two cases of which the undersigned counsel is aware that support the defendant's Sixth Amendment argument. To say those cases have not been followed and have limited value to this Court would be an understatement. As set forth above, other courts have repeatedly held that the capital case review process "is not a 'critical stage' of a criminal proceeding for Sixth Amendment purposes that affects a defendant's right to a fair trial." *Crusius*, 2020 WL 4340550, at *5 (collecting cases); *see also United States v. Stone*, No. 12-CR-072-JCC, 2013 WL 5934346, at *3 n.3 (E.D. Cal. Nov. 5, 2013); *Slone*, 969 F. Supp. 2d at 833–34. Even another judge in the same district reached a contrary conclusion to *Pena-Gonzalez* and *Gomez-Olmeda*. *See United States v. Torres-Gomez*, 62 F. Supp. 2d 402, 404–07 (D.P.R. 1999) (finding *Pena-Gonzalez* "mistaken" and that DPP does not implicate Sixth Amendment). The First Circuit also undercut the reasoning of *Pena-Gonzalez* and *Gomez-Olmeda* when it ruled in *Lopez-Matias* that a violation of JM policies does not give rise to the sanction of dismissing a death notice. *United States v. Lopez-Matias*, 522 F.3d 150, 156 (1st Cir. 2008) ("We conclude that a violation of the Manual, by itself, would not give rise to the sanction imposed here. We are reluctant to interfere with internal prosecutorial measures by elevating internal guidelines

---

[5] The second case cited by the defendant, *Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016), does not support the proposition that the DOJ review process is a critical stage. Rather, the issue in *Williams* was whether a former district attorney, who made the "critical" trial decision to authorize death, should have recused himself from presiding as a judge over the case.

to the level of a guarantee to defendants."). The First Circuit's decision vacated an order issued by the same judge who decided *Pena-Gonzalez* and *Gomez-Olmeda*.

Additionally, a criminal defendant's submission of mitigation information to the prosecution is not adversarial in nature. A defendant is given the opportunity to present information that may dissuade the Attorney General from seeking the death penalty, but there is no independent, neutral decisionmaker. Further, the process does not test the merits of the case, and no substantial rights of the defendant are at risk. The process does not circumvent a trial or foreclose any merits arguments by the defense. Nor does it affect the defendant's broad right to present mitigation information to the jury. Thus, in every material respect, the submission of mitigation information under the DPP is not a "critical stage" to which the right to effective assistance of counsel attaches.

## CONCLUSION

For the reasons set forth above, Youngblut's motion is without merit. The defendant continues to be afforded the opportunity to provide the government, but Youngblut has no enforceable right to participate in the government's internal death-penalty review process or to set its schedule. Were the Court to suggest otherwise, it would risk violating core separation-of-powers principles. Additionally, because the process is not a "critical stage" in this criminal litigation as that term is legally defined, Youngblut's Sixth Amendment claim must fail.

Accordingly, the Court should deny the defendant's motion. Neither an evidentiary hearing nor further briefing is necessary. Given that the current date for Youngblut's counsel to make its mitigation presentation to the CRC is two weeks away, the Government respectfully requests that this Court rule on the Motion as soon as possible.

Dated at Burlington, in the District of Vermont, July 14, 2025.

                    Respectfully submitted,

                    UNITED STATES OF AMERICA

                    MICHAEL P. DRESCHER
                    Acting United States Attorney

By:    *s/ Matthew J. Lasher*
        Matthew J. Lasher
        Assistant U.S. Attorney
        P.O. Box 570
        Burlington, VT 05402-0570
        (802) 951-6725
        matthew.lasher@usdoj.gov

        *s/ Lisa M. Thelwell*_____
        Lisa M. Thelwell
        Florida Bar No. 100809
        Trial Attorney
        Violent Crime and Racketeering Section
        United States Department of Justice
        1301 New York Avenue, N.W.,
        Suite 700
        Washington, D.C. 20530
        Telephone: 202-514-3594
        Email: lisa.thelwell@usdoj.gov

        *s/ Dennis Robinson*_____
        Dennis Robinson
        Maryland Bar No. 1406170247
        Trial Attorney
        Violent Crime and Racketeering Section
        United States Department of Justice
        1301 New York Avenue, N.W.,
        Suite 700
        Washington, D.C. 20530
        Telephone: 202-514-3594
        Email: dennis.robinson@usdoj.gov