UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cr-00015-cr-1 |
| | ) | |
| TERESA YOUNGBLUT, | ) | |
|     Defendant. | ) | |

**MOTION TO RECONSIDER COURT'S ORDER DENYING MOTION TO EXTEND DEADLINE TO PRESENT MITIGATING AND OTHER EVIDENCE TO THE DEPARTMENT OF JUSTICE**

On June 30, 2025, Teresa Youngblut filed a Motion to Extend the Deadline to Present Mitigating and Other Evidence to the Attorney General's Capital Case Review Committee. ECF 80. The government filed a response in opposition on July 14, 2025. ECF 88. On July 18, 2025, the Court signed an order denying Youngblut's motion, which was docketed on July 21, 2025. ECF 90. Youngblut now moves the Court to reconsider its order.

Youngblut recognizes that motions for reconsideration are "employed sparingly" and are subject to a heightened standard of scrutiny. *See United States v. Folks*, 2020 WL 5542707, at *1 (D. Vt. Sept. 16, 2020) ("Reconsideration is generally justified when there is: (1) an intervening change in controlling law; (2) new evidence; or (3) the need to correct a clear error of law or to prevent manifest injustice."). In this case, however, Youngblut requests that the Court consider the below submission under the more relaxed standard generally applicable to non-reconsideration motions. When the Court denied Youngblut's motion to extend the deadline for a mitigation submission, Youngblut's deadline for filing a reply had not yet passed. *See* Dist. Vt. L.R. 7(a)(5)(A) (setting 14-day deadline for reply memoranda). Under these circumstances, Youngblut respectfully asserts that applying the

1

heightened reconsideration standard would be inappropriate.[1]

## I.     Introduction

The government opposes defendant Teresa Youngblut's request that the Court extend the deadline to submit mitigation evidence to the Department of Justice. It does not dispute, however, that the current July 28th deadline will deny Youngblut a "reasonable opportunity" to present mitigation information to the Capital Review Committee, as required by the Justice Manual. Nor does it dispute that the extraordinarily accelerated timeline it has imposed in this case represents a sharp break from ordinary Department of Justice protocol. Instead, the government merely argues the separation of powers precludes this Court from exercising its inherent authority to grant Youngblut's requested relief. But the case law on which the government relies does not support its argument. The government cites cases holding that courts should be reluctant to interfere with prosecutors' decisions about "whether or not to prosecute, and what charge[s] to file or bring before a grand jury." ECF 88 at 8. Youngblut's motion, however, does not ask this Court to prevent the government from bringing any charges, or to bar the government from seeking the death penalty. The motion simply asks the Court to pause, briefly, the government's rushed seek/no-seek process so Youngblut has a meaningful opportunity to convince the Department of Justice that it should *choose* not to seek death. Because the government's separation-of-powers cases address situations unlike that presented in Youngblut's case, they do not speak to the question raised by the instant motion.

---

[1] Youngblut acknowledges that reply briefs ordinarily may "not exceed 10 pages." Dist. Vt. L.R. 7(a)(5)(B). Had this brief been filed as a reply in support of the original motion to extend the mitigation-submission deadline, Youngblut would have sought leave to file an over-length brief. But because the instant filing constitutes a motion, rather than a reply, Youngblut respectfully submits the 10-page limit is not applicable.

Youngblut's motion is ripe for decision. On July 9, 2025, the Court directed the defense to submit a proposed scheduling order consistent with Youngblut's requested relief, and gave the government 20 days to respond. ECF 82. Youngblut filed a proposed scheduling order on July 11, 2025, ECF 84, and the government has advised the defense that it does not intend to file a response to that submission. Youngblut still requests oral argument on this motion, and respectfully requests that the Court either rule on the motion before July 25, 2025, or temporarily stay the government's deadline for the defense presentation and decision whether to seek death until after the Court can decide the motion on a schedule amenable to the Court.

**II.     Argument**

    **A.     The government does not deny that the current July 28th deadline deprives Youngblut of a "reasonable opportunity" to submit mitigation evidence to DOJ.**

Defendant Teresa Youngblut's motion explained, and the government agrees, that the Justice Manual requires prosecutors to afford potential capital defendants a "reasonable opportunity" to present mitigation evidence to the Department of Justice (DOJ) before the attorney general authorizes prosecutors to seek the death penalty. ECF 80 at 9; ECF 88 at 5. In the motion, Youngblut argued the current July 28th deadline for submitting a mitigation presentation violates this requirement because, among other things, gathering mitigation materials is "'a time-consuming task'" that requires many months; Youngblut's defense team lacked learned counsel, who is responsible for developing and overseeing mitigation investigation, until mid-June; the defense was unable to retain a mitigation specialist until the middle of last month; and Youngblut's detention far from Burlington made it difficult, until recently, for the defense team to arrange the number of client visits that would ordinarily occur during this critical period. ECF 80 at 13-17 (quoting Am. Bar Ass'n, Guidelines for the

3

Appointment and Performance of Counsel in Death Penalty Cases 10.7 cmt., at 83 (revd. 2003)).

The government denies none of this—at least not with any conviction. It notes that the Court granted the defense's February 2025 request for appointment of learned counsel, as if to suggest the defense has enjoyed the services of learned counsel for five months. ECF 88 at 3. But the government does not deny that (1) original learned counsel was not available to work on this case for three months following appointment; (2) for reasons not foreseeable to the defense, she moved to withdraw from the case; and (3) despite diligent efforts, the defense was unable to secure replacement learned counsel until June 2025. *See* ECF 80 at 5-6 & n.7. The government also points out that defense counsel "provided mitigation information to the government on May 14, 2025, and the [United States Attorney's Office] incorporated the information in its correspondence with [the Capital Case Section]." ECF 88 at 4. What the government does not mention is that Youngblut submitted that information over objection and at a time when the defense had the assistance of neither learned counsel nor a mitigation specialist. Without those two essential team members, a substantive mitigation presentation is impossible—a fact the government does not dispute.

In short, the government does not meaningfully deny that the time it has given Youngblut to prepare a mitigation submission is "radically inadequate," ECF 80 at 19 n.11; that, as a result, any presentation to the Capital Review Committee on July 28th "has no realistic chance of serving its purpose," ECF 80 at 15; or that the current timeline will make it impossible for the Committee to give "'proper individualized consideration [to] the appropriate factors relevant to [Youngblut's] case,'" ECF 80 at 20 (quoting Justice Manual § 9-10.030). Indeed, the government all but concedes that it has chosen to deprive Youngblut

4

of "a reasonable opportunity to present information . . . which may bear on the decision whether to seek the death penalty." Justice Manual § 9-10.080. That silence stands in stark contrast with the government's response in other cases where potential capital defendants have asked the district court to extend their deadline for submitting a mitigation package. In those cases, the government has at least claimed to abide by its self-imposed obligation to afford defendants a "reasonable opportunity" to bring forward mitigation information. *See, e.g.*, *United States v. Aponte-Marquez*, No. 3:23-cr-273-PAD, ECF 1287 at 20 (D.P.R. June 4, 2025) (arguing the government "has provided the defendant a reasonable opportunity to present mitigation to the United States"). Not so here.

Nor does the government deny that its conduct in this case—requiring Youngblut to submit mitigation evidence before a capital indictment has even been returned—marks "a dramatic break from ordinary procedure," under which defendants have an average of 15 months following a capital indictment to gather the necessary mitigation materials. ECF 80 at 12-13. The overall tenor of the government's motion seems intended to create a false sense of normalcy about its actions in this case—implying the government is simply following the path laid down out the Federal Death Penalty Act (FDPA), faithfully executing the duties assigned to the DOJ by Congress. *See* ECF 88 at 5 ("[T]he statutory scheme does not contemplate any discussion with defense counsel prior to the Attorney General's announcement as to application of the death penalty in any particular case."). But the government's casual tone cannot obscure what an extreme departure this case represents from established procedures. For three decades now, since its promulgation following passage of the FDPA, federal prosecutors have adhered to the Justice Manual's Death Penalty Protocol, including its requirement that potential capital defendants have a

"reasonable opportunity" to submit mitigation evidence. The codification of that requirement represents the government's acknowledgement that a defendant's meeting with the Capital Review Committee represents the best, and perhaps only, chance to convince prosecutors not to seek a death sentence. Yet the government in this case attempts, for all practical purposes, to write that requirement out of the Justice Manual, to Youngblut's severe detriment.[2]

And the government offers no explanation for its break with protocol and no justification for its unprecedented haste in considering whether to impose the most serious punishment of all. It does not suggest, for example, that this case presents special circumstances that justify an "unusually rushed" timeline, ECF 80 at 3, or assert that Youngblut's need to investigate mitigation is somehow different from other defendants'. The government's apparent desire to speed up the death-authorization process goes entirely unexplained.

> B. **The government has not shown that the Court lacks authority to order a brief extension of Youngblut's deadline for submitting mitigation evidence.**
>
> 1. **The government's separation-of-powers cases are irrelevant to the relief Youngblut seeks.**

Rather than defend its decision to violate the Justice Manual, the government primarily argues that the Court, in granting Youngblut's motion, "would violate separation-of-powers principals [sic]." ECF 88 at 2. The government contends Youngblut has asked this

---

[2] The government notes that "[e]ven if a notice of an intention to seek the death penalty is authorized, it can be reconsidered and possibly withdrawn." ECF 88 at 6. This observation appears designed to minimize the importance of the defense's initial mitigation submission and meeting with the Capital Review Committee. As the government concedes, however, *see* ECF 88 at 6, the Justice Manual authorizes withdrawing a notice of intent only when there have been "material changes in the facts and circumstances of the case from those that existed at the time of the initial determination." Justice Manual § 9-10.160(A). And the possibility that the government could, at some point in the indeterminate future, reconsider a death authorization under a stricter standard does nothing to mitigate the current prejudice to Youngblut's ability to participate meaningfully in the authorization process now.

Court to intrude on "what is an exclusively Executive function—a decision on whether to pursue a potential charge that is eligible for the death penalty and whether to seek the death penalty in such a case." ECF 88 at 1. To understand why that is wrong, it is helpful to review the various stages of a federal capital case and the steps prosecutors must take at each stage.

The FDPA permits imposition of the death penalty only if the statute under which a defendant is charged expressly authorizes a death sentence. *See* 18 U.S.C. § 3591(a) (providing for capital punishment if defendant "has been found guilty of" 18 U.S.C. § 794, 18 U.S.C. § 2381—both of which are "punish[able] by death"—or "any other offense for which a sentence of death is provided"). Crimes established by such statutes are known as "death-eligible offenses." *United States v. Quinones*, 313 F.3d 49, 53 (2d Cir. 2002). If the government wishes to seek the death penalty, it must indict a defendant for a death-eligible offense.

But indictment for a death-eligible offense, standing alone, is insufficient to "render[ a defendant] death-eligible," i.e., potentially subject to a death sentence. *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 109 (2d Cir. 2008). Before a defendant becomes death-eligible, the government must also allege (1) at least one of the four intent factors in § 3591(a)(2), e.g., that the defendant "intentionally inflicted serious bodily injury that resulted in the death of the victim"; and (2) at least one of the aggravating factors enumerated in § 3592(c), e.g., that the defendant committed the offense for "pecuniary gain" or "committed the offense in an especially heinous, cruel, or depraved manner." These two "gateway factors" must be found by a grand jury and included in an indictment. *In re Terrorist Bombings*, 552 F.3d at 108-09 (citing *Ring v. Arizona*, 536 U.S. 584 (2002)). Frequently, though not always, prosecutors will obtain an indictment that charges a death-

7

eligible offense but does not include gateway-factor allegations, and then they will subsequently file a superseding indictment that re-alleges the death-eligible offense and includes a grand jury's "special findings" as to the gateway factors. *E.g.*, *United States v. Fell*, 360 F.3d 135, 138 (2d Cir. 2004).

But even after obtaining an indictment that alleges both a death-eligible offense and the gateway factors, the government still may not seek the death penalty. The FDPA also requires the government, "a reasonable time before the trial," to file and serve on the defendant a notice "stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the government will seek the sentence of death." § 3593(a)(1). This "notice of intent" is the culmination of the Department of Justice's Death Penalty Protocol, as outlined in the Justice Manual. *See* Justice Manual § 9-10.130 ("The Attorney General will make the final decision whether the Government should file a notice of intent to seek the death penalty."). The Justice Manual provides that, in the leadup to that decision, the government must afford a potential capital defendant a "reasonable opportunity" to present mitigation evidence, and must invite the defense to meet with the Capital Review Committee to discuss that evidence. *Id.* §§ 9-10.080, 9-10.130.[3]

This background makes clear the error in the government's position. According to the

---

[3] The government writes that "[i]f a United States Attorney has requested authorization to seek the death penalty, a [Capital Case Section] attorney must request a conference with defense counsel, the [Capital Review Committee], and representatives of the U.S. Attorney's Office." ECF 88 at 6. That description of the authorization process is accurate but incomplete. Per the Justice Manual, the Capital Case Section schedules a meeting with defense counsel not only when the U.S. Attorney's Office wishes to seek death, but also when—in the absence of a U.S. Attorney's recommendation for death—"two or more members of the Capital Review Committee" believe the government should pursue the death penalty. Justice Manual § 9-10.130.

8

government, granting Youngblut's motion would "infringe on the Executive Branch's exclusive prosecutorial discretion in deciding whether [to] charge a death eligible offense or to seek the death penalty in this case." ECF 88 at 2; *see also* ECF 88 at 1 (claiming requested relief would intrude on "an exclusively Executive function—a decision on whether to pursue a potential charge that is eligible for the death penalty and whether to seek the death penalty in such a case"). That is inaccurate. Youngblut's motion asks the Court to "direct[] the government to (1) extend the deadline for her Department of Justice submission by at least six months, and (2) refrain from making a decision about whether to seek the death penalty until the Capital Review Committee has reviewed the materials she submits." ECF 80 at 3-4. That's all Youngblut seeks—extension of a deadline. The motion does *not* ask the Court to prohibit the government from "charg[ing] a death eligible offense," i.e., an offense that carries a punishment up to death, and it does *not* ask the Court to bar the government from "seek[ing] the death penalty in this case," i.e., alleging the gateway factors in an indictment and filing a notice of intent. ECF 88 at 2. Should the Court grant Youngblut's motion, nothing will prevent the government from indicting death-eligible offenses or seeking the death penalty in this case. The government will simply be required to do so on a slightly less accelerated timeline.

The government's case-law citations suffer from a similar flaw. The government cites cases holding that "the decision 'whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's discretion],' so long as it is supported by probable cause." ECF 88 at 8 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1968) (brackets in original)); *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996) ("[C]ourts are properly hesitant to examine the decision whether to prosecute.");

9

*United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000) ("[T]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate."). Those cases arose in the context of vindictive- or selective-prosecution claims, where defendants argued the government should be prohibited from prosecuting them because the decision to indict was motivated by improper considerations. If the defendants were correct, then the indictments would have had to be dismissed. *See Bordenkircher*, 434 U.S. at 360; *Armstrong*, 517 U.S. at 461; *Sanders*, 211 F.3d at 716.

But Youngblut's motion does not ask the Court to dismiss the indictment, to preclude the government from charging death-eligible offenses, or to prevent the government from seeking the death penalty. The motion does not ask the Court, in other words, to decide "whether or not" the government may "prosecute" her, *Bordenkircher*, 434 U.S. at 364; "what charge[s]" the government may "file," *id.*; or "whether [the government may] seek the death penalty," ECF 88 at 8. Youngblut simply asks the Court to direct the government to briefly pause its decision-making process so prosecutors can meaningfully consider mitigating evidence before making the seek/no-seek decision. Even if the Court grants that relief, the government will ultimately be entirely free to file death-eligible charges and to seek the death penalty against Youngblut. Unlike in *Bordenkircher*, *Armstrong*, and *Sanders*, the relief sought will in no way constrain the government from exercising its discretion to pursue certain charges (or a certain penalty).

The government also notes that cases like *Armstrong* "'rest[] in part on an assessment of the relative competence of prosecutors and courts.'" ECF 88 at 9 (quoting 517 U.S. at 465). As the Supreme Court put it in *Armstrong*, "[s]uch factors as the strength of the case,

the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." 517 U.S. at 465. Such reasoning has no application to this case, as Youngblut's motion does not ask this Court to conduct an independent "analysis" that would supplant the government's judgment about whether to indict Youngblut for death-eligible offenses or whether the death penalty is appropriate. *Id.* Should the Court grant the requested relief, the government will remain free to file whatever charges it deems appropriate and to seek the death penalty, or not seek the death penalty, as it sees fit. The defense recognizes that only prosecutors are "competent" to make those decisions, *id.*, and granting Youngblut's motion would not suggest otherwise.

Relatedly, *Armstrong* counsels against courts' involvement in prosecutorial charging decisions because "[e]xamining the basis of a prosecution . . . threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry[] and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." 517 U.S. at 465. These concerns, too, have no place in Youngblut's case. Ordering the government to extend the deadline for submitting mitigation evidence will not require this Court to examine "the prosecutor's motives and decisionmaking" for (potentially) seeking a death sentence. As explained above, Youngblut's requested relief will leave the attorney general with undiminished authority to make whatever decision she wishes on the seek/no-seek question, and to do so for whatever reasons she wishes. And that relief will not "reveal[] the Government's enforcement policy." *Id.* If anything, in fact, it will prevent disclosure of the government's enforcement policies—i.e., the government's views about which cases warrant the death penalty—by delaying a seek/no-seek decision. In short, the

11

reasoning of the separation-of-powers cases cited by the government does not support denying Youngblut's motion.[4]

### 2. Cases about federal courts' "supervisory powers" do not counsel against granting Youngblut's motion.

The government asserts this Court may exercise its inherent authority only if complained-of governmental conduct "would violate some constitutional provision, statute, or rule." ECF 88 at 9. Therefore, the government argues, the Court lacks authority to grant Youngblut's motion because there is no enforceable rule—e.g., in the Justice Manual or the Judicial Conference's guidelines—that entitles potential capital defendants to a reasonable opportunity to present mitigating evidence to the DOJ. ECF 88 at 10-12 & n.4. The government is mistaken.

For the proposition that courts' inherent authority is limited to remedying violations of the Constitution, statute, or rule, the government cites *United States v. Gatto*, 763 F.2d 1040 (9th Cir. 1985). ECF 88 at 9. That case involved the scope of federal courts' "supervisory power" over the "administration of criminal justice." *Gatto*, 763 F.2d at 1045. Youngblut's motion, however, is not rooted in courts' "supervisory power" over criminal cases, but rather in their "inherent power"—in both criminal and civil cases—"to set deadlines and enter scheduling orders that govern the pace at which litigation must proceed." ECF 88 at 11; *see, e.g.*, *Culpepper v. Bank of Am., N.A.*, 2019 WL 343253, at *1 (D. Conn. Jan. 28, 2019) ("[D]istrict courts have the inherent authority to manage their dockets and

---

[4] *Armstrong* also says that examining prosecutorial charging decisions "delays [a] criminal proceeding." *Id.* Youngblut recognizes that this concern is relevant to the relief sought in this motion. But as explained previously, the government's July 28th deadline has put this case on an extraordinarily rushed timeline. Youngblut merely asks the Court to restore this case to something resembling a normal pace for capital cases. Indeed, Youngblut's proposed schedule contemplates a significantly more compressed timeline than is typical in federal capital cases. *See* ECF 80 at 12-13.

courtrooms with a view toward the efficient and expedient resolution of cases."); *Hill v. Griffin*, 2018 WL 5078255, at *2 (W.D.N.Y. Oct. 18, 2018) ("[T]he Court possesses inherent authority to control the disposition of the causes on its docket."); *United States v. McGill*, 2010 WL 1571200, at *3 (S.D. Cal. Apr. 16, 2010) (ordering government to extend deadline for mitigation submission based on "the Court's inherent authority" to "further[] the goal of speedy and orderly administration of justice" and to "ensure that the relevant issues to be tried are identified, that the parties have an opportunity to engage in appropriate discovery and that the parties are adequately and timely prepared so that the trial can proceed efficiently and intelligibly"); *United States v. Carrillo*, 2020 WL 6591198, at *2-3 (N.D. Cal. Nov. 11, 2020) (same). Thus, the purported rule found in *Gatto* is irrelevant to the relief Youngblut seeks.

Even if Youngblut's motion implicated this Court's "supervisory powers" over the administration of criminal justice, the Second Circuit has not adopted as narrow a view of those powers as the Ninth Circuit did in *Gatto*. The Second Circuit recognizes that federal courts may use their supervisory powers to "implement a remedy for violation of recognized rights," *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008), as well as to "deter illegal conduct" and to "preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury," *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 135 (2d Cir. 2017). But it appears the Second Circuit has never said those are the *only* permissible reasons to exercise supervisory powers, and indeed, the court has cautioned that "[i]t would be ill-advised to limit improvidently this inherent power for fear of misuse." *United States v. McSherry*, 226 F.3d 153, 155-56 (2d Cir. 2000).

Regardless, any limitations on federal courts' supervisory powers are a product of the

circumstances in which defendants typically invoke those powers. "[G]enerally," the Second Circuit has explained, "the exercise of supervisory power arises in the context of requests by defendants to vacate convictions, dismiss indictments, or invalidate sentences." *United States v. Johnson*, 221 F.3d 83, 96 (2d Cir. 2000). These remedies may pose "separation of powers" problems, *see HSBC Bank USA, N.A.*, 863 F.3d at 129, because they potentially prevent the government from prosecuting a defendant entirely, from bringing certain charges, or from securing what the government believes to be a just sentence. But again, the relief Youngblut seeks will have none of those effects. If the Court grants Youngblut's motion, the government will still be able to bring death-eligible charges and to seek the death penalty in this case. All Youngblut requests is a modest amount of additional time to meaningfully lobby the government to *choose* not to seek the death penalty. Such a remedy would not "'encroach on the central prerogatives of a coequal branch.'" ECF 88 at 9 (quoting *United States v. Slone*, 969 F. Supp. 2d 830, 836 (E.D. Ky. 2013)).[5]

But even if the Court believes it can exercise its inherent powers only to remedy the violation of some procedural rule, the Court still should grant Youngblut's motion. Federal law provides that in capital cases, defendants are entitled to a minimum of two attorneys, "of whom at least 1 shall be learned in the law applicable to capital cases." 18 U.S.C. § 3005. And to the extent that "investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt *or the*

---

[5] The government relies on, and quotes extensively from, the district court's opinion in *Slone* to support its separation-of-powers argument. ECF 88 at 9-12. That decision is unpersuasive for all the reasons just explained. Among other things, *Slone* (1) relies on cases interpreting federal courts' "limited supervisory power over criminal procedure," which is not at issue in Youngblut's motion; and (2) asserts courts may use that power "only to remedy the violation of recognized rights, preserve the integrity of judicial proceedings, and deter illegal conduct." 969 F. Supp. 3d at 835-36.

14

*sentence*," a capital defendant must be provided those services at no cost. 18 U.S.C. § 3599(f) (emphasis added). A capital defendant, in other words, is statutorily entitled to learned counsel and a mitigation specialist, both of whom play an indispensable role in building a mitigation submission. *See* ECF 80 at 15-17. As a practical matter, those statutory rights would be severely compromised if the government could decide to seek the death penalty little more than a month after learned counsel and a mitigation specialist have joined a defense team. Because it often takes a year or more to build even the outline of a mitigation case, *see* ECF 80 at 13-15, the rights conferred by § 3005 and § 3599(f) would be illusory if the government could force a defendant to make a mitigation presentation roughly six weeks after securing learned counsel and a mitigation specialist.

## III.  Conclusion

The government's unexplained haste in this case not only is highly irregular, but also may end up being self-defeating. As the government acknowledges, *see* ECF 88 at 3 n.2, Attorney General Pam Bondi's February 5, 2025 memorandum to DOJ employees specifically mentions Youngblut's case as one in which prosecutors "are expected to seek the death penalty."[6] But that memorandum also provides that the DOJ policy of seeking death in cases "involving the murder of a law-enforcement officer" shall not apply if "significant mitigating circumstances" exist.[7] That proviso would be meaningless if the government did not provide Youngblut (and other potential capital defendants) with a genuine opportunity to demonstrate that their cases involve "significant mitigating circumstances." The result would

---

[6] Pam Bondi, Memorandum for all Department Employees, "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions," at 2 (Feb. 5, 2025), *available at* https://www.justice.gov/ag/media/1388561/dl.

[7] *Id.*

15

effectively be a de facto policy of automatically pursuing capital punishment in all cases involving a law-enforcement officer's death. Given the dubious legality of such a no-exceptions policy, a death notice filed on the current timeline will likely result in additional legal challenges that only delay this case further. Youngblut's case therefore represents an especially strong candidate for exercising this Court's inherent power to ensure the "orderly and expeditious disposition of cases." *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 487 (2d Cir. 2013).

Dated: July 21, 2025

                              Respectfully submitted,

By:    */s/ Steven L. Barth*
       STEVEN L. BARTH
       Assistant Federal Public Defender
       Office of the Federal Public Defender
       District of Vermont
       95 Pine Street, Suite 150
       Burlington, VT 05401
       Phone: (802) 862-6990
       Email: steven_barth@fd.org

       Christine Lehmann
       Senior Staff Attorney
       Louisiana Capital Assistance Center
       636 Baronne St.
       New Orleans, LA 70113
       (504) 558-9867
       clehmann@thejusticecenter.org

       Julie L.B. Stelzig
       Assistant Federal Public Defender
       6411 Ivy Lane, Suite 710
       Greenbelt, MD 20770
       Phone: (301) 344-0600
       Email: julie_stelzig@fd.org

       Counsel for Teresa Youngblut