UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cr-00015-cr-1 |
| | ) | |
| TERESA YOUNGBLUT, | ) | **Capital Case** |
| Defendant. | ) | |

## Motion for Preservation of Law Enforcement Communications, Recordings, Photographs, and Other Information

Defendant Youngblut, pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution and the Federal Rules of Criminal Procedure, moves this Court to order preservation of law enforcement communications, recordings, photographs, videos, and other information contained in cell phones and other devices (hereinafter "Law Enforcement Device Contents") used by any law enforcement officers or agents involved in the days-long surveillance, stop, and shooting that are the focus of this case.[1] The government has not preserved the Law Enforcement Device Contents despite an earlier promise to do so, and despite its duty to seek out and preserve relevant evidence in this case, including evidence that may be disclosable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). This motion is timely, because the Law Enforcement Device Contents exist only on personal

---

[1] The relevant law enforcement agencies include but are not limited to, the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), U.S. Customs and Border Protection (including the U.S. Border Patrol) ("CBP"), the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco and Firearms ("ATF"), the Office of Inspector General ("OIG"), Vermont State Police, Orleans County Sheriff's Department, Newport City Police Department, Lyndonville Police Department, the Constables of Coventry, the Vermont Attorney General's Office, the Department of State's Attorneys and Sheriffs and the Orleans' States' Attorney and any other office or agency involved in the surveillance, stop, and arrest of Youngblut (collectively, the "Involved Parties").

1

and work-issued devices currently in the hands of law enforcement agents and therefore are at significant risk of being deleted or otherwise destroyed.

This motion seeks only preservation, not disclosure, of the Law Enforcement Device Contents. It seeks to avoid a situation in the future in which this Court and the parties will be faced with the challenge of remedying the loss of critical evidence pursuant to the standards articulated in *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984). It is also because this motion seeks to avoid destruction of critical evidence that the defense files at this time, despite this Court's order suspending motions deadlines, ECF 114.[2]

## I.    Factual and Procedural History

From January 14 to January 20, 2025, law enforcement—including officers and agents of the Involved Parties—conducted surveillance of Youngblut in northern Vermont. That surveillance involved, among other things, tailing the car (a Toyota Prius) that Youngblut was in, monitoring Youngblut's hotel, and approaching and initiating conversation with Youngblut while agents posed as local civilians. On January 20, 2025, after six days of surveillance, the United States Border Patrol pulled over the Prius driven by Youngblut. Toward the end of that 36-minute stop, both Youngblut and a passenger in the vehicle (referred to in the complaint as Felix Baukholt) were forcibly ordered out of the vehicle. Thereafter, shots were fired, including by at least one Border Patrol agent. ECF 5-1 at 3. Border Patrol Agent David Maland and Felix Bauckholt were killed during the gunfire.

---

[2] At the joint request of the parties, the Court has not yet set a deadline for the filing of pretrial motions, in part because discovery remains ongoing. ECF 113, 114. Due to the increasing risk of the loss of critical evidence with the passage of additional time, the defense feels constrained to file this motion now.

ECF 5-1 at 3. A federal grand jury subsequently indicted Youngblut on one count of second-degree murder of a federal law enforcement officer, under 18 U.S.C. §§ 1111, 1114(a); one count of using a deadly weapon to assault, resist, and interfere with a federal employee, under 18 U.S.C. § 111(a)(1), (b); one count of discharging a firearm during and in relation to a crime of violence, under 18 U.S.C. § 924(c)(1)(A)(iii); and one count of violating § 924(c) with death resulting, under 18 U.S.C. § 924(j)(1). ECF 96 at 1-4.

On February 14, 2025, defense counsel sent a letter to Assistant United States Attorney (AUSA) Matthew Lasher requesting "preservation of all evidence related to the incident," including evidence "not directly in your possession, custody or control," and inclusive of evidence "from any law enforcement body or any other investigative or administrative body or other person or entity involved in a response to, an investigation of, or in any way connected to this Incident." More specifically, the letter requested the preservation of, inter alia, "[a]ll messages, including text messages and voice messages, related to the incident, using any platform, application or electronic medium from or to the Involved Parties," "[a]ny correspondence with union representatives related to the Incident," and "[a]ll audio, video and electronic recordings related to the Incident (before, during, or after the Incident)." Exhibit A. AUSA Lasher replied via email on February 14th, indicating the government's intention to preserve all evidence in the case, except for one Border Patrol agent's uniform components. *See* Exhibit B.

The government produced limited batches of discovery on February 21, June 2, and July 23, 2025. Noting very little in the discovery reflecting law enforcement communications, recordings, or other materials relating to the extended surveillance and traffic stop of Youngblut, defense counsel requested those materials in a letter sent to the

3

government on October 14, 2025.[3] *See* Exhibit C.

While those requests remained pending, defense counsel met in person with AUSA Lasher on January 22, 2026, regarding, inter alia, the status of discovery. Defense counsel inquired about the status of the preservation of law enforcement communications and other materials related to the surveillance, stop, and arrest in this case, specifically via cell phones and similar devices, as those communications had so far not been produced in discovery. AUSA Lasher informed defense counsel that investigators had retained and planned to review Agent Maland's work and personal cell phones but that, for all other involved agents, the government had *not* systematically reviewed or preserved law enforcement communications via cell phone or any similar devices. Rather, AUSA Lasher informed defense counsel that the government had simply asked these other agents not to destroy any relevant communications. At the time of the January 22nd meeting, the government advised that it was not planning to review or preserve these materials unless it became aware of specific new information indicating the likely presence of discoverable evidence on one or more of the devices in question.[4]

In a February 13, 2026, letter to the government, the defense reiterated its request for more robust preservation of the Law Enforcement Device Contents, requesting that the government preserve full forensic copies of all phones and other devices used by law enforcement officers involved in the surveillance, stop, and arrest of Youngblut:

---

[3] Some limited video recordings of earlier surveillance appear to have been produced from at least one agent's device, but without information on what preservation steps the government took, it is impossible for the defense to know whether these brief recordings comprise the universe of relevant information from that agent's device, let alone from other devices or other agents. *See infra* note 3.

[4] As of the date of this filing, the government has not produced in discovery any information obtained from Officer Maland's work or personal cell phones.

> The fact that the communications of officers involved in the surveillance and vehicle stop of defendant Youngblut – including communications preceding, during, and immediately following the charged offenses – were not immediately collected and preserved following the incident is highly troubling, especially in light of the defense's clear demand, sent to you on February 14, 2025, to preserve all such information. **We ask that the government take immediate steps to secure and extract full forensic copies of all the phones or other devices used by officers/agents in the surveillance, stop and investigation of the stop**. To the extent the government takes the position that any requested information is no longer available, we request a full accounting of what efforts were made to secure or retrieve any such information since January 20, 2025.

Exhibit D (emphasis added). The government has not yet responded to this request.

At the January 22, 2026, meeting, AUSA Lasher informed defense counsel that an additional discovery production would be forthcoming within the next month, so defense counsel deferred filing a preservation motion while awaiting this production. On March 6, 2026, the government produced a limited set of additional materials; that production did not contain the Law Enforcement Device Contents or a response to the defense request for more information on their preservation.

Voluntary discovery in this case is still ongoing and not near completion. The defense understands that the government is stretched thin given its multiple responsibilities; indeed, the two parties jointly applied for and were granted a suspension of deadlines to allow the voluntary discovery process to continue at a manageable pace for the government. This agreement between the parties, however, has been contingent upon the government's prior promise to preserve evidence generally, and in particular to preserve certain critical items, including the Law Enforcement Device Contents. This motion seeks to ensure such preservation has occurred or will occur promptly.

II.     **Legal argument**

   A.     **The law enforcement device contents are relevant and potentially disclosable to the defense.**

Law enforcement in this case surveilled Youngblut and Bauckholt in Vermont for multiple days beginning on January 14, 2025. After days of surveillance by multiple law enforcement agencies in which Youngblut and Bauckholt spoke to realtors regarding properties, officers tracked Youngblut and Bauckholt to a Walmart parking lot where they observed them snacking, talking on the phone, wrapping unknown items in foil, and purchasing an item that appeared to them to be either a bolt cutter or a snow scraper but was in actuality a roll of aluminum foil.[5] USBP Agent Wilda ordered fellow agent Chris Maland to make a pretextual traffic stop of the vehicle as soon as it left the parking lot.[6] Additional law enforcement documents, created after the fact, assert that the stop was due to immigration concerns.[7] By this point, however, law enforcement had already checked on the immigration status of Bauckholt (a German national) and determined that he was in the U.S. on a valid visa.[8]

Based on information produced in discovery, on January 20, 2025, law enforcement initiated a stop of the Prius in which Youngblut and Bauckholt were traveling, immediately after the vehicle left a Walmart parking lot where it was being monitored. Over thirty

---

   [5] *See* Bates No. 1589.03.

   [6] *See id*.

   [7] *See* Complaint, ECF No. 5-1, at 2-3 (describing the stop "to conduct as immigration inspection as it was driving southbound on Interstate 91 in Coventry, Vermont. The registered owner of the vehicle, Felix Baukholt[sic], a citizen of Germany, appeared to have an expired visa in a Department of Homeland Security database.").

   [8] Bates No. 1408.02 ("On Wednesday, January 15, 2025, HSI identified Bauckholt as a visa holder."); Bates No. 1589.04 ("Wilda stated that on the prior Wednesday, the BEST team became aware that the male suspect's immigration status was that he was in the US on an H1-B visa.")

minutes after the stop of the vehicle, the decision was made to approach Youngblut and

Bauckholt with force, remove them from the Prius, and detain them on suspicion of "alien

smuggling,"[9] despite the already-established validity of Bauckholt's visa. It was thereafter

that shots were fired.

Multiple law enforcement officers from multiple state and federal agencies were

involved in this set of events. These officers all used cell phones and other communication

devices during the surveillance, stop, and arrest, communicating among each other and

frequently recording aspects of these events via these devices.[10] Discovery shows that

officers used not only work-issued cell phones and devices but also personal cell phones and

devices during this investigation.[11]

The defense has received memos of FBI interviews of officers involved in the

surveillance, stop, and arrest of Youngblut and Bauckholt. Defense investigation into the

veracity and consistency of these accounts is ongoing, but there are reasons to question the

---

[9] Bates No. 6206.02 ("WHIPPLE told MALAND they could arrest her for alien smuggling as at that point the male is out of status and they do not know if he crossed from Canada and she picked him up.")

[10] *See, e.g.*, Bates No. 01408.03 ("Wilda began filming and taking pictures of the subjects on his phone" while surveilling the subjects in the Walmart parking lot on January 20, 2025); Bates No.1408.02 ("Wilda called USBP Agent Chris Maland [from the Walmart parking lot] at approximately 12:18pm to give an update on what happened on Tuesday, January 14, 2025, and Sunday, January 19, 2025. Wilda asked Maland to make a traffic stop of the Prius if the Prius leaves the Wal-Mart parking lot, to which Maland responds 'yes'."); Bates No. 1408.03 ("During another call with Maland [from the parking lot], Maland asked Wilda if Wilda believed the tinfoil indicated if the subjects were involved with drugs. Wilda responded 'no.'" ); Bates No. 1408.03 ("Wilda called Russell for surveillance relief [from the parking lot]."); Bates No. 1474 ("Maland always wore his phone on his vest, sort of like where someone would wear a body camera."); Bates No. 1474.02 ("Whipple thought Maland ran the checks for the car stop through his phones, either work or personal, and not over the radio."); Bates No. 1597 (SBPA Cameron Thompson's account including cell phone usage in relation to the stop and shooting).

[11] Bates No. 00096 (noting that Maland's personal cell phone was still at Newport Station: "I think there was talk about releasing it to the family, but if it was used for phone calls for record checks. . . ."); Bates No. 1474.02 ("Whipple thought Maland ran the checks for the car stop through his phones, either work or personal, and not over the radio.").

accuracy and forthrightness of these law enforcement accounts. First, because both Bauckholt and Youngblut were shot by law enforcement during the stop (Bauckholt, fatally), the involved officers' actions necessarily faced particular scrutiny, including via a U.S. Customs and Border Protection (CBP) investigation. Second, at least some of the involved officers reached out to their union representatives and retained lawyers immediately after the incident. As a result, CBP and FBI interviews with involved officers regarding the incident were delayed and were eventually conducted only with lawyers present.

Communications among law enforcement actors involved in the surveillance and stop are clearly relevant to a number of issues in the case and should be preserved so that they can be disclosed to the defense if necessary. This includes communications in the leadup to the surveillance and stop and the aftermath. Also relevant are any internet searches related to the surveillance, stop, and arrest of Youngblut.

Federal Rule of Criminal Procedure 16(a)(1)(E) requires the government to produce all documents and objects within the government's possession, custody, or control that are "material to preparing the defense," and it is unquestionable that contemporaneous accounts of the surveillance, stop, and arrest are material to preparing the defense in this case. Material too are the accounts and communications in the leadup and aftermath of the surveillance, stop, and arrest in which unvarnished law enforcement perspectives likely exist. The Law Enforcement Device Contents must also be preserved because the government may be required to disclose them in the future pursuant to Federal Rule of Criminal Procedure 26.2 (Producing a Witness's Statement) and the Jencks Act (18 U.S.C. § 3500). In addition to providing crucial information about how the stop unfolded, which is relevant to whether the government can prove the mental states required by the charged offenses, the officers'

communications may shed light on their motives and bias, which could impact their credibility.

Additionally, the Due Process Clause requires the disclosure of information that is favorable to the defense and material to the defendant's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The government's *Brady* obligation "extends to impeachment evidence as well as exculpatory evidence," *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)), and also to mitigating evidence in a capital case, *see, e.g.*, *United States v. Bowers*, No. CR 18-292, 2021 WL 9351137, at *2 (W.D. Pa. June 21, 2021) ("*Brady* and Rule 16 allow for broad discovery regarding mitigating evidence.").

The government's *Brady* obligation also extends to favorable information not in its immediate possession, but in the possession of individuals and agencies acting on the government's behalf. Indeed, under *Kyles v. Whitley*, prosecutors have an affirmative obligation to investigate and preserve all exculpatory evidence in the possession of law enforcement, regardless of whether that evidence has previously come to its attention. 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

In *Kyles*, the Supreme Court made clear that it is the prosecution's responsibility to ensure that *Brady* is followed, and that prosecutors cannot delegate that responsibility to individual police officers:

> [The State of Louisiana] suggested below that it should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor. [This] amount[s] to a serious change of course from the *Brady* line of cases . . . . Since . . . the prosecutor has the means to discharge the government's *Brady*

9

> responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

514 U.S. at 438; *see also United States v. Alvarez*, 86 F.3d 901 (9th Cir. 1996) ("Because the government's failure to turn over exculpatory information in its possession is unlikely to be discovered and thus largely unreviewable, it is particularly important for the prosecutor to ensure that a careful and proper *Brady* review is done. *Delegating the responsibility to a nonattorney police investigator* to review his own and other officers' rough notes to determine whether they contain *Brady*, *Bagley*, and [*Giglio v. United States*, 405 U.S. 150 (1972)] information *is clearly problematic*." (emphasis added)).

In *United States v. Axel Danilo Ramos-Lopez*, No. 18-MJ-1910, ECF 15 (D.N.M. July 5, 2018), the court ordered the preservation of "governmental agency communications surrounding the investigation and arrest" of the defendant because such evidence was potentially exculpatory and relevant to possible defenses. More recently, in the capital case *United States v. Petty*, the trial court granted a motion to preserve video and audio recordings in the possession of the government, since the preserved recordings likely contained material that would be favorable to the defense in mitigation. *United States v. Petty*, No. 25-cr-00123, 2025 WL 1333860 (D. Colo., May 7, 2025).

In the instant case, the Law Enforcement Device Contents are potentially supportive of possible pre-trial motions and trial-phase arguments or defenses, and may also constitute impeachment and/or mitigation evidence. As in *Petty* and *Ramos-Lopez*, the material should therefore be preserved.

The government claims to have instructed the multitude of different law enforcement officers from different agencies involved in this case not to destroy relevant evidence. But

10

the government has not disclosed the exact instructions given to these officers or how those instructions were conveyed.[12] Substantial questions therefore remain, including:

- Were law enforcement officials told simply not to delete relevant evidence?

- Were they told to preserve such evidence, and if so, how?

- Were the officers given guidance about what might constitute relevant evidence, or were they left to determine which evidence is relevant on their own?

- Were the officers informed of the heightened need to preserve evidence because of an anticipated capital prosecution (as was publicly announced 15 days after the incident by then-Attorney General Pam Bondi)?

- Were officers asked what settings their phones and devices had that might automatically delete potentially relevant information after a certain period of time, and instructed to change those settings to prevent such automatic deletion?

With these and related inquiries wholly unaddressed, the government's preservation efforts are impossible to evaluate. The little information provided by the government to date also raises substantial concerns that prosecutors may have improperly delegated their duty to preserve relevant and likely favorable evidence to law enforcement agents, who—given Bauckholt's death and the gunshot wounds sustained by Youngblut—may have a personal interest in ensuring that such evidence does not survive.

This motion seeks only to compel preservation of evidence; the defense is not yet moving for disclosure. As noted above, the defense's goal is to avoid a situation in the future in which this Court and the parties will be faced with the challenge of remedying the loss of

---

[12] Defense counsel have requested this information but have not yet received a substantive response.

11

critical evidence pursuant to the standards articulated in *Arizona v. Youngblood*, 488 U.S. 51, (1988), and *California v. Trombetta*, 467 U.S. 479 (1984). *See Trombetta*, 467 U.S. at 486 ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.").

**B.      The evidence should be preserved *immediately* because the defense has so far relied on the government's promise of preservation, potentially to its detriment, and because of the likelihood that the evidence will be inadvertently destroyed.**

The need for the requested preservation order is heightened in this case given the initial defense preservation letter and the government's favorable response. The defense has relied on the government's promise to preserve and therefore did not, for instance, request a preservation order from this Court.

The "law is clear that, based upon their unique role in the criminal justice system, prosecutors generally are bound by their assurances, particularly when defendants rely to their detriment upon those guarantees." *Commonwealth v. Cosby*, 252 A.3d 1092, 1134 (Pa. 2021). This is so because when a "defendant detrimentally relies on the government's promise, the resulting harm from this induced reliance implicates due process guarantees." *Gov't of Virgin Islands v. Scotland*, 614 F.2d 360, 365 (3d Cir. 1980); *see also Cosby*, 252 A.3d at 1135 ("[A]t a minimum, when a defendant relies to his or her detriment upon the acts of a prosecutor, his or her due process rights are implicated.").[13]

---

[13] In *Cosby*, the Pennsylvania Supreme Court ruled that prosecution of the defendant was precluded because the prosecutor's office unconditionally promised that the defendant would not be charged, and he relied on that promise to his detriment by subsequently giving inculpatory testimony in a related civil proceeding. 252 A.3d at 1131 ("[W]hen a prosecutor

12

It is also essential that the preservation occur immediately because of the likelihood that the Law Enforcement Device Contents will be destroyed via inadvertence or, given the passage of time, via automatic deletion.

Currently, the Law Enforcement Device Contents exist on the personal devices of multiple law enforcement officers employed at multiple different state and federal law enforcement agencies. The defense has no knowledge of the current location of these devices (apart from the two phones of Agent Maland) but assumes that they are, for the most part, still in the personal possession of the involved officers.

As this Court is no doubt aware, accidental data deletion on cell phones and similar devices is extremely common, due to settings that automatically delete certain data after a given period of time, or user error such as incorrect tapping of keys, improper file management, and factory resets. Phones can be damaged or lost and have insufficient cloud-based back-ups. People also switch devices and do not transfer over all relevant data. Recovery of deleted data may be possible, but newer storage technologies and security measures have made the process of retrieving deleted data increasingly complex, and time is of the essence as deleted data is gradually overwritten. Also, cellular service providers do not themselves retain call detail records and text messages for long periods, which means this information may be available only on the devices themselves.

---

makes an unconditional promise of non-prosecution, and when the defendant relies upon that guarantee to the detriment of his constitutional right not to testify, the principle of fundamental fairness that undergirds due process of law in our criminal justice system demands that the promise be enforced."). The promise in *Cosby* was made via a press release. *Id.* at 1105–06. The court found that a non-prosecution decision conveyed in such a manner was sufficient to raise due process concerns and rejected the idea that a written agreement was required before a due process violation could occur. *Id.* at 1142 ("Neither the trial court, nor the Commonwealth for that matter, cites any legal principle that requires a prosecutor's assurances to be memorialized in writing in order to warrant reasonable reliance.").

13

It does not appear that the law enforcement agencies themselves are adequately tracking and ensuring the preservation of the Law Enforcement Device Contents. Agent Maland's personal cell phone, for example, which may have been used to film the arrest and shooting itself,[14] was almost released in this case without being reviewed or extracted for evidentiary purposes.[15]

### C.    The need for preservation is heightened in a capital case.

As this is a capital case, special considerations apply. The Eighth Amendment requires a heightened standard of reliability in the determination that a death sentence is the appropriate punishment in a specific case. *Caldwell v. Mississippi*, 472 U.S. 320, 323, 341 (1985); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). Thus, a court in a capital case must be "particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). This heightened need for reliability requires that "capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding" and has been the basis for "condemn[ing]" a multitude of procedures in capital cases "that might be completely

---

[14] *See* Bates No. 1474 ("MALAND always wore his phone on his vest, sort of like where someone would wear a body camera. If MALAND was using his phone to record, he would have had to turn it on before the stop.").

[15] Bates No. 00096 (noting that Maland's personal cell phone was still at Newport Station: "I think there was talk about releasing it to the family, but if it was used for phone calls for record checks. . . .").

14

acceptable in an ordinary case." *Satterwhite v. Texas*, 486 U.S. 249, 263 (1988) (Marshall, J., concurring in part and concurring in the judgment).

**Conclusion**

In light of the above, the defense moves this Court to order the government to secure, extract, and preserve full forensic copies of all cell phones or other devices—work, personal, or otherwise—used by officers and agents involved in the surveillance, stop, arrest, and shooting and the leadup to and aftermath of those events. The defense also moves the Court to direct the government to provide a full and detailed accounting of all steps it has taken since January 20, 2025, to identify and preserve evidence from law enforcement cell phones and other devices. Finally, the defense requests that the Court schedule a hearing on this motion.

A proposed order is attached.

Dated: July 1, 2026

Respectfully submitted,

By:    */s/ Steven L. Barth*
STEVEN L. BARTH
Assistant Federal Public Defender
Office of the Federal Public Defender
District of Vermont
95 Pine Street, Suite 150
Burlington, VT 05401
Phone: (802) 862-6990
Email: steven_barth@fd.org

15

Rebekka Higgs
Law Office of Rebekka Higgs, LLC
P.O. Box 134
Conifer, CO 80433
Phone: (303) 489-8505
Email: rh@higgs-law.com


Julie L.B. Stelzig
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Phone: (301) 344-0600
Email: julie_stelzig@fd.org


Counsel for Defendant Youngblut